**HARRISON**

**v.**

**OHIO DEPARTMENT OF REHABILITATION AND CORRECTION.**

Court of Claims of Ohio.

No. 95–08250.

Decided Oct. 2, 1997.

*Richard F. Swope,* for plaintiff.

*Betty D. Montgomery,* Attorney General, and *Eric A. Walker,* Assistant Attorney General, for defendant.

---

DEAN STRAUSBAUGH, Judge.

The court conducted a bifurcated trial to determine whether defendant, the Ohio Department of Rehabilitation and Correction, is liable for injuries suffered by plaintiff, James W. Harrison, while he was incarcerated at the Warren Correctional Institution ("WCI").

## FINDINGS OF FACT

On February 6, 1992, plaintiff was transferred to WCI from Ross Correctional Institution ("RCI"), where he was serving a five-to-twenty-five-year sentence on his 1991 conviction for complicity to armed robbery. Upon his arrival at WCI, plaintiff was examined by the staff of the psychology department. As a result of the examination, the staff noted in plaintiff's mental health file that he would likely have problems adjusting to penal life and that his cellmates should be

approved by a member of the psychology staff. It was also noted that plaintiff considered himself a transsexual in that he believed he was a woman trapped in a man's body. Despite the notation in his mental health file and without consulting WCI's psychology department, plaintiff was housed with the general inmate population.

Shortly after entering the general population, plaintiff claims, he was befriended by fellow inmate Tom Wood. Plaintiff testified that because of his small stature and effeminate characteristics, Wood offered him protection. Initially, plaintiff's relationship with Wood was based upon mutual friendship; however, it eventually evolved into voluntary sexual relations and a drug trafficking partnership.

A review of plaintiff's penal file reveals numerous rule violations. Throughout his incarceration at WCI, plaintiff appeared before the Rules Infraction Board ("RIB") on fourteen separate occasions from July 1992 through September 1993. During the RIB process, the accused inmate is housed in a "segregation" unit, which is a separate cell block used to house those inmates who threaten security and orderly management of an institution. Once the RIB makes its determination, the inmate is either released back into the general population or placed in a disciplinary unit where he serves a specified period of time as punishment.

During one of his alleged violations, plaintiff testified that he made statements to staff members regarding drug dealing and assaults among the inmates. Plaintiff asserts that he made statements that resulted in the disciplining of certain inmates. Plaintiff also revealed to officials his relationship with inmate Wood and their drug-dealing operation at WCI. At trial, prison officials testified that plaintiff offered information regarding various inmates, but that such information was erroneous or already known. Plaintiff testified that during this period, someone broke into his locker box and removed letters that he wrote to prison officials about inmate activities. He further testified that Wood obtained the letters, made copies, and distributed them to other inmates. As a result, plaintiff believed that his life was in danger.

The court finds that plaintiff later developed a close friendship with inmate John Stinson and that as a result of his new friendship, plaintiff's relationship with Wood soured. Plaintiff testified that Wood began beating him and demanding extortion money from both him and Stinson. Although plaintiff intended that the money be used to finance the drug business, he testified that Wood was, instead, pocketing the money. Plaintiff testified that he became so fearful of Wood that on September 7, 1993, while in the dining hall, he threw a glass of Kool-Aid on Lieutenant John Sears for the purpose of being placed in the segregation unit. After throwing the Kool-Aid on Lt. Sears, plaintiff was subdued and escorted to the segregated unit. Since Lt. Sears used force on

plaintiff, an investigation was initiated to determine whether the force was excessive. The investigation resulted in a finding that Lt. Sears did not use excessive force in subduing plaintiff.

During this period, plaintiff's parents contacted prison officials and expressed concern for their son's safety. The parents testified that they had received threatening phone calls demanding money in exchange for plaintiff's safety. As a result of their concerns, Ohio State Highway Patrol Trooper James Daugherty questioned plaintiff regarding his incarceration at WCI. During the questioning, plaintiff told Trooper Daugherty about his relationship with Wood, and that Trooper Daugherty did not need to get involved. Thereafter, Trooper Daugherty notified plaintiff's parents regarding the interview.

While in the segregation unit awaiting a decision from the RIB, plaintiff formally completed a "request for protective custody (PC)." A "PC" is a permanent cell assignment that is separate from the general prison population. Its purpose is to house inmates facing a significant and verifiable risk of physical harm from a specific inmate or group of inmates in the general population. An inmate is placed in PC only if there is evidence that protection is warranted and there are no reasonable alternatives. Initially, the unit staff reviewed the circumstances surrounding his PC request to determine whether to deny it or submit it to the Protective Control Reviewing Committee. Ultimately, plaintiff's request was forwarded to the committee. During the period that the committee was reviewing his request, plaintiff was placed in "protective control investigation" ("PCI"), which is a holding status for inmates pending PC approval. While under PCI status, plaintiff remained in the segregated unit. Generally, PCI inmates are in a cell alone or with inmates who do not pose a threat of harm to them. Because the segregation unit was full, plaintiff was placed in a cell with other inmates.

Upon completion of its investigation, WCI concluded that plaintiff, Stinson, and Wood were caught up in a triangle of sex, drugs, and lies. Thereafter, WCI recommended that plaintiff be transferred to the Trumbull Correctional Institution ("TCI"), rather than placing him in WCI's PC unit. Although WCI recommended an institutional transfer, at the trial, plaintiff provided an interoffice communication dated October 22, 1993, which appeared to grant plaintiff's PC request. At no time while in PCI status was plaintiff notified of the interoffice communication. Sergeant Harold Crider, plaintiff's unit manager, testified that he was uncertain as to why plaintiff was granted PC on October 22, 1993. Regardless of plaintiff's apparent PC placement, he remained in PCI status.

Upon learning of his proposed transfer, plaintiff testified that he was in fear of harm because a former WCI inmate named Martin had been transferred to TCI based upon information plaintiff supplied to WCI officials. Plaintiff claims that

he was so despondent over his proposed transfer that on December 6, 1993, he attempted suicide by cutting his wrist. As a result, plaintiff was taken to the infirmary, where he remained until mid-January 1994.

Plaintiff also testified that on December 3, 1993, while in segregation, his cell was "shaken down" by corrections officers. After the shakedown, plaintiff filed an informal complaint alleging that (1) the corrections officers used excessive force, (2) plaintiff's personal items were erroneously removed, and (3) plaintiff was subjected to physical humiliation. Thereafter, a thorough investigation was conducted, which found insufficient evidence to substantiate plaintiff's claims.

On December 19, 1993, while in the infirmary recovering from his suicide attempt, plaintiff appealed his proposed transfer. At this point in time, it was known throughout WCI's inmate population that plaintiff had informed prison officials of drug dealings and assaults among the inmates. As a result, plaintiff claimed that PC placement was necessary because he was known as a "snitch" among the inmates. Thereafter, on January 2, 1994, Warden Anthony Brigano notified plaintiff that he would be granted a PC assignment pending approval from the Department of Rehabilitation and Correction's main office in Columbus.

While in segregation under PCI status, plaintiff received a threatening letter. Plaintiff believed that inmate Wood might have sent the letter and notified prison officials. Thereafter, WCI officials sent the letter to the Bureau of Criminal Investigations in London, Ohio, to conduct a fingerprint analysis. The analysis did not match inmate Wood's fingerprints.

Eventually, plaintiff wrote Shirley Pope, Senior Research Associate for the Correctional Institution Inspection Committee, a legislative oversight committee designed to investigate inmate complaints. In his correspondence to Pope, plaintiff complained about the treatment he was receiving at WCI. Thereafter, Pope contacted Warden Brigano, who subsequently ordered an investigation into plaintiff's complaint. At no time did plaintiff inform Pope that he was being raped and beaten. As a result of the investigation, Warden Brigano apprised Pope of WCI's finding that plaintiff was involved in a triangle of sorts with inmates Stinson and Wood.

On January 13, 1994, also while recovering in the infirmary, plaintiff requested a "racial separation" to prevent him from being celled with black inmates. Racial separations are used by prison officials when an inmate's situation warrants not placing an inmate in a cell with inmates of different races. Although the date is not known, Deputy Warden of Programs, Steve Huffman, approved plaintiff's racial separation after talking with plaintiff's unit manager, Sergeant Crider. Crider testified that he did not remember speaking with Huffman regarding plaintiff's request for a racial separation.

Although the separation request was apparently granted, plaintiff was in fear for his safety because the paperwork was missing from his unit file until December 1994. Further, plaintiff testified that he was constantly tormented by the staff whenever he inquired about his status. In fact, plaintiff testified that his unit manager, Charlotte Owens, threatened that he would never receive a racial separation. Owens denied the allegations at trial. At no time after January 13, 1994, did plaintiff occupy a cell with a black inmate. However, black inmates were housed in the same unit.

On February 8, 1994, plaintiff was permanently housed in WCI's PC unit. In July 1994, plaintiff reported to officials that from October through December 1993, he had been beaten and raped by inmates Banks and Taylor while in the segregation unit on PCI status. Plaintiff alleges that corrections officers were aware of the continued assaults but failed to take any action. Plaintiff testified that both Banks and Taylor were members of the "Folks," a black inmate gang that plaintiff had informed against. Plaintiff claims that he failed to report the rapes earlier because he was in fear for his life. Upon investigating plaintiff's allegations, WCI determined that plaintiff's delay in reporting the alleged rapes, coupled with the inconsistencies of his story, rendered his allegations not credible.

On September 3, 1994, plaintiff reported that he had been raped earlier that morning and that he had also been raped on September 1, 1994. Plaintiff stated that he was unable to identify the perpetrators because his face was covered by a blanket during the incidents. Upon reporting the rapes, Captain William Bost escorted plaintiff to the infirmary for an examination. At the infirmary, plaintiff was examined by a staff nurse. When treating rape cases, the nurses are not authorized to extract semen samples; rather, they are to formulate a "nursing assessment" to determine whether the institution's doctor should be called in to procure such a sample. After visually examining plaintiff's anal cavity, the nurse did not find any semen or fresh lacerations indicating sexual intercourse. However, the nurse did note an older superficial laceration in plaintiff's anal cavity. Further, plaintiff had showered subsequent to the alleged rape that morning, thereby jeopardizing the procurement of semen evidence. Because plaintiff showered after the alleged rapes, the absence of visible evidence and the delay in reporting the rapes, WCI's doctor was not called. Plaintiff was subsequently questioned by Captain Karl Mockabee regarding the allegations, after which plaintiff signed a statement admitting that he had lied about the rapes. At trial, plaintiff testified that he was coerced into signing the statement.

Defendant provided the expert testimony of WCI's staff psychologist Ronald Nelson, Ph.D. Dr. Nelson, who had performed a psychological assessment of plaintiff, opined that plaintiff suffers from a borderline personality disorder. He described plaintiff as a "malingerer" who manipulates those around him in order

to escape the results of his conduct. Plaintiff did not provide expert testimony at trial.

## CONCLUSIONS OF LAW

Specifically, plaintiff contends that defendant was negligent (1) in failing to have its psychology department review the records of plaintiff's cellmates, (2) in its manner of housing plaintiff while in a segregation unit, (3) for not honoring plaintiff's racial separation order, (4) in failing to heed plaintiff's continual pleas for protection from harassment, assaults, and manipulation by fellow inmates, (5) for failing to properly investigate plaintiff's allegations of rape, and (6) for proposing to transfer plaintiff to another institution where black inmates, whom plaintiff allegedly informed against, were incarcerated. Defendant denies any liability.

In order for plaintiff to prevail on his claim of negligence, he must prove by a preponderance of the evidence that defendant owed him a duty, that it breached that duty, and that the breach proximately caused his injuries. *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469–470.

Ohio law imposes a duty of reasonable care upon the state to provide for its prisoners' health, care, and well-being. *Clemets v. Heston* (1985), 20 Ohio App.3d 132, 136, 20 OBR 166, 169–170, 485 N.E.2d 287, 291–292. However, the state is not an insurer of inmate safety. See *Williams v. Ohio Dept. of Rehab. & Corr.* (1991), 61 Ohio Misc.2d 699, 702, 583 N.E.2d 1129, 1131–1132. Accordingly, the question for the court is whether defendant breached its duty of reasonable care under the circumstances of this case.

The court finds that plaintiff failed to prove by a preponderance of the evidence that defendant's failure to honor its psychology department's request to approve his cellmates constituted negligent conduct. In essence, plaintiff is arguing that his small, effeminate appearance coupled with the request noted in his mental health records necessitated special celling consideration. The court does not agree. Defendant is responsible for the incarceration of tens of thousands of individuals. It is well settled that decisions such as the housing of inmates are given deference. *Bell v. Wolfish* (1979), 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447. Absent persuasive evidence to the contrary, the court is unwilling to impose a higher standard of care owed to plaintiff, nor will it second-guess the housing classifications of correctional institutions. To impose a higher standard of care, under the circumstances of this case, would render defendant an insurer of inmate safety.

■■    The court also finds that plaintiff failed to prove by a preponderance of the evidence that defendant was negligent in housing plaintiff in the segregation unit while under PCI status.  Upon review, the court finds that placing plaintiff within the segregation unit was not unreasonable or in contravention of a known risk of harm.  Plaintiff claims that he was continually beaten and raped while in the segregation unit.  The court finds that plaintiff did inform prison officials of drug trafficking and assaults among the inmates.  However, at no time during his numerous communications with either the prison staff, his parents or Shirley Pope did plaintiff state that he was being raped and beaten by inmates Banks and Taylor.  Only after the passing of seven months did plaintiff make such assertions to prison officials.  It is the trial court's responsibility, as the trier of fact, to weigh the evidence and the credibility of witnesses.  See *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 39 O.O.2d 366, 367, 227 N.E.2d 212, 213–214.

■    Having considered the totality of the evidence, the court finds that plaintiff failed to meet his burden of proof that the rapes and beatings actually occurred.  Alternatively, even if the court were to find that plaintiff has met his burden of proof that the rapes and beatings occurred, liability will not be found because defendant did not have notice of an impending threat of harm.  It is well-settled law that the state is not liable for the intentional attack on an inmate by another inmate unless there is adequate notice of an impending assault.  See *Baker v. State* (1986), 28 Ohio App.3d 99, 28 OBR 142, 502 N.E.2d 261; *Williams v. S. Ohio Correctional Facility* (1990), 67 Ohio App.3d 517, 587 N.E.2d 870; *Belcher v. Ohio Dept. of Rehab. & Corr.* (1991), 61 Ohio Misc.2d 696, 583 N.E.2d 1128.

Upon review of the evidence and credibility of the witnesses, the court finds that plaintiff failed to prove that, under the circumstances of this case, defendant either had notice of an imminent threat of harm to plaintiff or was negligent in any manner regarding its placement of plaintiff in the segregation unit.

■    Plaintiff further claims that defendant was negligent in failing to honor his racial separation.  It is clear from the evidence that no mention of plaintiff's racial separation appeared in his unit file prior to December 1994.  Furthermore, plaintiff failed to show that he was adversely affected after January 13, 1994.  The court also finds that plaintiff did not suffer harassment at the hands of the prison's staff regarding the existence of his racial separation.  Although plaintiff was never placed in a cell with a black inmate after January 13, 1994, WCI's PC unit still housed black inmates.  The court finds that plaintiff failed to prove by a preponderance of the evidence that defendant's failure to have plaintiff's racial separation order in his unit file caused plaintiff any injury.  Furthermore, the record is devoid of expert testimony evidencing negligent conduct on behalf of

WCI for housing black inmates within the same PC unit as plaintiff. Absent such evidence, the court is unwilling to disturb defendant's housing decisions.

Plaintiff also claims that defendant failed to heed his continued pleas for protection from harassment, assaults, and manipulation by fellow inmates. The court does not agree. Throughout his incarceration, WCI officials investigated plaintiff's numerous complaints, from Trooper Daugherty's investigation of threatening phone calls and extortion of plaintiff's parents, to investigations conducted by Captains Bost and Mockabee. The court finds that WCI officials acted reasonably and conscientiously regarding plaintiff's pleas for help. As stated earlier, the court finds that plaintiff's correspondence failed to adequately apprise prison officials of specific threats of harm against him. Rather, plaintiff expressed generalized concerns common to all incarcerated individuals. To find defendant negligent based upon such correspondence would be contrary to settled law. See *Williams, supra.* Ohio penal institutions are under a duty to reasonably provide for their prisoners' health, care, and well-being. The court fails to find, under the circumstances of this case, that defendant acted negligently in investigating those concerns raised by plaintiff, his family, or Shirley Pope. Furthermore, the court finds that the conclusions reached by the WCI's investigators comported with the evidence presented at trial. It is apparent that WCI could not have prevented the situation that plaintiff found himself in with inmate Wood.

The court also finds that plaintiff failed to prove by a preponderance of the evidence that defendant was negligent in its investigation of plaintiff's alleged rapes. Plaintiff reported to WCI officials that he was raped on two occasions. The court finds that WCI's investigation of plaintiff's allegations of rapes at the hands of inmate Banks and Taylor was reasonable in light of plaintiff's seven-month delay in reporting the rapes and the contradictory information revealed during WCI's investigation. The court also finds that the investigation of plaintiff's alleged September 1994 rapes was reasonable in light of plaintiff's subsequent retraction.

Upon review, the court finds that plaintiff failed to prove by a preponderance of the evidence any claim asserted in his complaint.

*Judgment for defendant.*

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, sitting by assignment.