# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### September 5, 2013 Session

## KENNETH E. KING v. ANDERSON COUNTY, TENNESSEE

**Appeal by Permission from the Court of Appeals, Eastern Section**
**Circuit Court for Anderson County**
**No. B0LA0397     Donald Ray Elledge, Judge**

---

**No. E2012-00386-SC-R11-CV - Filed November 21, 2013**

---

We granted permission to appeal in this case to decide whether, for the purpose of determining proximate cause, an assault on an inmate by another inmate is always reasonably foreseeable because penal institutions house dangerous individuals. The plaintiff sued for injuries allegedly suffered as a result of negligence on the part of the staff of the Anderson County Detention Facility in classifying and housing the plaintiff and in failing to release him in a timely manner. The County denied any negligence on its part. The trial court found that while the County was not negligent in its classification or housing of the plaintiff, it had a duty and breached that duty in failing to timely release him. The trial court awarded the plaintiff $170,000 in damages, excluding medical bills, and assessed 55% of the fault to the County and 45% to the plaintiff. The Court of Appeals affirmed the trial court's actions, making an additional finding that proximate cause existed sufficient to link the plaintiff's injuries to the County's breach of its duty to timely release him. We reverse the Court of Appeals and trial court in part and hold that Anderson County is not liable for failing to release the plaintiff in a timely manner because the injuries Mr. King suffered as a result of the delay were not reasonably foreseeable. The award of damages is vacated, with the exception of the statutorily mandated payment of the plaintiff's medical bills, and the case is reversed and remanded to the trial court for dismissal.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgments of the Court of Appeals and Circuit Court**
**Affirmed in Part and Reversed in Part**

CORNELIA A. CLARK, J. delivered the opinion of the Court, in which JANICE M. HOLDER, WILLIAM C. KOCH, JR., and SHARON G. LEE, JJ., joined. GARY R. WADE, C.J., filed a dissenting opinion.

Jonathan Swann Taylor, Knoxville, Tennessee, for the appellant, Anderson County, Tennessee.

Bruce D. Fox, Clinton, Tennessee, and Ronald C. Koksal, Knoxville, Tennessee, for the appellee, Kenneth E. King.

## OPINION

### I. Facts and Procedural History

This appeal arises from a negligence claim Kenneth E. King ("Mr. King" or "Plaintiff") filed against Anderson County, Tennessee ("Anderson County") for injuries Mr. King sustained during an altercation with another inmate while he was in custody at the Anderson County Detention Facility.[1]  The facts recited summarize the proof introduced at trial.

Mr. King is a resident of Claxton, Tennessee, where he worked steadily as a machinist for many years before being laid off in 2008.  Mr. King is divorced and at the time of the incident at issue here was forty-one years old.  During that period he had custody of his three children, then approximately eighteen, sixteen, and seven, the youngest of whom still lives with him.  Before the evening of October 27, 2009, Mr. King had been arrested twice in Anderson County: once in 2000 for driving on a suspended license, and a second time in 2004 for driving on a suspended license, as well as for violating the registration law, bumper law, seat belt law, and child restraint law.  Mr. King also was arrested once in Georgia many years ago for driving under the influence, and he had a juvenile record.  Mr. King testified that he never spent the night in jail on any of these occasions.

In January 2009, Mr. King was ticketed for a traffic violation in Clinton, Tennessee, and subsequently summoned to Clinton City Court on charges of driving with an expired license and without insurance.  By the time of his court appearance in February 2009, Mr.

---

[1] Mr. King originally filed this action in the Circuit Court for Anderson County, Tennessee, alleging a negligence claim against Anderson County and also seeking recourse for violations of his constitutional rights pursuant to 42 U.S.C. § 1983.  Anderson County removed the case to the District Court for the Eastern District of Tennessee.  Plaintiff responded by moving to remand all claims arising under the Tennessee Governmental Tort Liability Act to Circuit Court.  The District Court granted Plaintiff's motion and remanded the state law claims to the Circuit Court for Anderson County, while retaining jurisdiction over the Plaintiff's claims brought under federal law.  The proceedings in federal court were stayed pending resolution of Mr. King's state law claims.

King had renewed his license and obtained insurance, and as a result the charges were dismissed. However, this information was not reported correctly to the State.

On October 27, 2009, shortly before 6:00 p.m., Mr. King was pulled over by Officer Charles R. Faircloth of the Anderson County Sheriff's Department in Anderson County, Tennessee. Mr. King testified that Officer Faircloth informed him that he had been stopped because his headlights were not turned on in the rain and because he had abruptly pulled out in front of and almost hit Officer Faircloth's patrol car. Mr. King further testified that Officer Faircloth then asked for Mr. King's license, registration, and proof of insurance. Mr. King admitted that he produced his license but did not have his registration or proof of insurance. Officer Faircloth returned to his vehicle and after a few minutes re-approached Mr. King and asked him to step out of his car.

At this point, Mr. King asked Officer Faircloth why he was being asked to step out of his vehicle. Officer Faircloth responded that he was being placed under arrest. When Mr. King asked why he was being arrested, Officer Faircloth told him that it was because he was driving on a suspended license. Mr. King testified that he told Officer Faircloth that there "must be some type of mistake" because he had not had a ticket "in a long time," begged Officer Faircloth to check again, and asked to call his family to tell them what was happening. Officer Faircloth refused to let him make a phone call at that time. Mr. King then became angry with Officer Faircloth, cursing at him. When Mr. King exited his car, he was not immediately compliant with Officer Faircloth's direction to put his hands behind his back to be handcuffed. By his own admission, Mr. King was "anything but cooperative" during the course of the arrest. Officer Faircloth then drove Mr. King to the Anderson County Detention Facility.

Mr. King and Officer Faircloth arrived at the Anderson County Detention Facility at 6:20 p.m., according to Anderson County records. Shortly thereafter, Mr. King was booked and his personal effects confiscated, which included his wallet, $305.00 in cash, a lighter, cigarettes, and clothing.[2] During booking, Mr. King was asked about his mental and physical health as well as any medications he was taking. Mr. King testified, and police records indicate, that he informed the officers that he had back problems and was taking oxycodone and Soma, both of which had been prescribed to him. Mr. King further testified that his medication, consisting of a bottle of over thirty pills, was taken from him at the time of his

---

[2] Although the Inmate Property Inventory listed the wallet it does not specify any cash. In March 2011, however, Mr. King received a check from the Anderson County Sheriff's Department for $305.00 from their seized money account.

arrest.[3]  The officer who booked Mr. King, Officer Christopher Lumley, testified that Mr. King was also asked during this process if he had any enemies in jail or if he had ever had to be separated from another inmate at Anderson County or any other detention facility.  Mr. King responded no to both questions.  On cross-examination, Mr. King testified that he understood that if he had any enemies in jail, he could tell the jail staff and they could do something about it.

The Anderson County Detention Facility has a policy that inmates are not to discuss their charges with other inmates or staff.  The rationale behind the policy is in part to protect inmates arrested on drug-related charges from being searched by other inmates seeking drugs. Officer Lumley testified that he does not routinely tell inmates not to discuss their charges, as that rule is contained in the Inmate Handbook.  Officer Lumley did not recall informing Mr. King of this rule during the booking and classification process.  However, on cross-examination, Mr. King admitted that he knew of the policy not to discuss charges.

As part of the booking process, Officer Lumley classified Mr. King and determined his level to be medium rather than minimum security, designating him a "1" on his booking sheet, which refers to "pretrial misdemeanant" in the Anderson County system.[4]  According to Officer Lumley's testimony, Mr. King's classification was based on the information in Mr.

---

[3] The Inmate Booking/Medical Screening Questionnaire confirms that Mr. King informed the police of his medical conditions and medications, but under "List All Medications Brought in by Patrol with the Inmate" lists "none."  Mr. King was not charged with any drug-related offense.

[4] According to the Anderson County Detention Facility Policy 4.03, there are three basic levels of classification: maximum, medium, and minimum.  Chief Jailer Avery Johnson testified that these three main security levels are supplemented by other levels such as protective custody and suicide watch.  The policy mandates that "[i]nmates shall be classified and housed in the least restrictive housing available without jeopardizing staff, inmates, or the public," using risk factors that include "any or all of the following:"

1. Current offense or conviction
2. Offense history
3. Escape history
4. Institutional disciplinary history
5. Prior convictions
6. Alcohol and/or drug abuse
7. Stability factors

The policy also provides that "[s]pecial [c]onditions" "[m]ay temporarily or permanently override a classification assessment," and includes the caveat that "[t]he Sheriff has limited or no means of controlling the number or type of offenders that may be sent to him for incarceration at any given time.  However, continual efforts will be made to house inmates consistent with their individual classification."

King's intake form, which listed his sole charge as "driving on suspended or revoked [license]," pursuant to Tennessee Code Annotated section 55-50-504 (2012). The Arrestee Intake Form also indicated that Mr. King had been verbally abusive during the stop, and next to the question "Did the Arrestee Resist," the boxes for both "yes" and "no" were checked. Officer Lumley testified when questioned that when an inmate is brought in for a driving offense but is "uncooperative, resisted arrest and was verbally abusive to the [arresting] officer," those would be grounds for placing the inmate in either medium or maximum security, based upon the criteria listed in Anderson County Detention Facility Policy 4.03. However, Officer Lumley could not recall any details of how he booked Mr. King. Avery Johnson, the Chief Jailer, also confirmed that "behavior" was a factor taken into consideration when classifying inmates, and that Mr. King was properly classified. Officer Lumley acknowledged that he probably did not indicate to Mr. King at this time how he had been classified, although he stated that inmates of different classifications were issued different colored clothing.

At 12:25 a.m., October 28, 2009, Mr. King was taken to housing unit 306, a medium security unit. Mr. King testified that when he arrived at his cell, his cellmates were all awake and playing cards. Mr. King was given a mat, blanket, and a place to sleep on the floor as the cell had no remaining bunks. According to the testimony of Chief Johnson, Anderson County's Detention Facility has a capacity of 226. However, on the night of October 27-28, there were over 250 inmates. Although some of Mr. King's cellmates were facing serious charges, including violent felonies such as attempted murder, aggravated kidnapping, and aggravated assault, one had a charge similar to Mr. King's and none had a record of institutional behavioral problems, according to Anderson County records. Brandon Paul, the cellmate who would later assault Mr. King, had been housed in the jail without incident since July 10, 2009. Soon after Mr. King arrived, his cellmates appear to have asked him about his charges. Mr. King testified on cross-examination that he told them of his charge of driving on a suspended license and indicated during his rebuttal testimony that he told his cellmates that he had been carrying medication which was taken from him at the time of his arrest.[5]

Mr. King remained in his cell until approximately 8:57 a.m. the next morning without incident, at which point he was removed from his cell, according to Anderson County records. During the night, Mr. King testified, he could not sleep because people "hollered a lot," and he was "scared," although he did not claim to have been frightened of anyone in particular nor did he report any threats to jail staff. At 10:36 a.m. on October 28, 2009, Mr. King left the jail to attend his arraignment hearing in the General Sessions Court for Anderson County,

_____

[5] The County's counsel indicated during Mr. King's cross examination that at one point the Sheriff was contemplating drug charges against Mr. King, and Mr. King may have believed he would be charged with a drug possession offense because he had prescription pain medication in his car.

-5-

where the Judge ordered Mr. King's pretrial release. Terri McCloud, an Anderson County employee, was the pretrial release officer. She was not present in the courtroom when the Judge ordered Mr. King's release. Captain Larry Davidson, an employee of the Anderson County Detention Facility, confirmed that Ms. McCloud told him that she had received the paperwork authorizing Mr. King's release by fax at 11:30 a.m.[6] According to Chief Johnson's testimony, Ms. McCloud's only job was to process the pretrial release paperwork, and Mr. King was the only person scheduled to be released that day. Nevertheless, Ms. McCloud, whose office is two and a half miles from the Detention Facility, did not arrive at the jail until after 3:00 p.m., a delay of almost three hours and forty-five minutes.[7] According to Anderson County policy, "[i]nmates are entitled to timely release when they have . . . received a court ordered release." Mr. King was returned to the Anderson County Detention Facility at 12:04 p.m., where he was placed in a holding cell, fed lunch, and ordered to take a shower. At 2:23 p.m., because Ms. McCloud still had not arrived to process his pretrial release, Mr. King was taken from the holding cell back to cell 306, where he had spent the previous night.

Mr. King provided slightly differing accounts of the events that occurred after he returned to cell 306. Mr. King initially testified that he fell asleep on the floor of the cell and awoke to find Mr. Paul standing over him, saying "that they were going to shake me down" and asking if he knew what that meant, at which point someone began to hit him. "The one with the dreadlocks said that he thought that I had drugs on me," Mr. King said, "[a]nd I told him I didn't care what he thought." He claimed that he then blacked out, returning to consciousness to find himself pinned down on the floor, his pants pulled down, while someone said "get him, get him." But when Mr. King recounted the incident to jail officials and the jail nurse immediately afterward, according to the nurse's report, he said that his cellmates "thought he had drugs because he had discussed them, [as] the reason for being in jail." Mr. King also admitted on cross-examination that when he returned to his cell, Mr. Paul confronted him, saying that he believed Mr. King had drugs, to which Mr. King responded that he "did not give a f---" what Mr. Paul thought.

At 3:13 p.m. an "all-available" call went out at the jail from central control, and at least six officers responded. They found Mr. King in his cell, his right eye and face "extremely swollen," and "bleeding, lots of blood" coming from his head, according to testimony by Officer Thomas Hartsfield. Two officers took Mr. King from his cell into the day area, and from there he was brought to the jail nurse in the medical office. The jail nurse reported that

---

[6] The Plaintiff's attorney stated that Ms. McCloud received that paperwork by fax at 11:33 a.m., and Captain Davidson confirmed that this fact correlated with Ms. McCloud's statements to him.

[7] Ms. McCloud was subpoenaed and appeared at the request of Anderson County's and Mr. King's counsel but did not testify at the trial of this matter.

Mr. King had "blood on his face, hands, and clothing," and that "his eye is purple, his nose appears broke [sic]." Mr. King told the nurse that he had been assaulted and that during the course of the attack his pants had been pulled down, his testicles fondled and his rectum digitally penetrated. Mr. King resisted the jail nurse's attempts to ice his nose and eyes, complaining that it was too painful; she gave him ibuprofen. Describing his injuries in later testimony, Mr. King insisted that both eyes were injured and swollen, despite evidence that only the right eye was seriously damaged.

Back in the cell, Officer Hartsfield and Officer Richard Parker took part in questioning Mr. King's cellmates. Although some initially indicated to Officer Parker that Mr. King had fallen, according to Officer Hartsfield's testimony and Officer Michael Lowe's report, Mr. Paul soon admitted that he had hit Mr. King. At that point, Officers Parker and Hartsfield noticed blood on Mr. Paul's pants and underwear, suspected that a sexual assault might have occurred, and seized Mr. Paul's clothing. Officer Harold Crowley, a criminal investigator with the Anderson County Sheriff's Department, then interviewed all of the cellmates. They offered him varying accounts of what had occurred, but more than one indicated that Mr. King had fought with Mr. Paul.[8] When Officer Crowley spoke with Mr. King at the hospital, Mr. King said that Mr. Paul accused him of "having drugs and not sharing," at which point Mr. Paul began hitting him. Mr. King could not give a written statement at that time as he was receiving medical treatment. When Officer Crowley contacted Mr. King again six days later to get a formal statement, Mr. King, acting on the advice of counsel, refused to speak with him. At this point the Anderson County Sheriff's Department ended its investigation, and no charges were ever filed against Mr. Paul.

Meanwhile, as Mr. King was being treated in the medical office, Ms. McCloud appeared to process the paperwork for his pretrial release, according to Captain Davidson's later report. According to Officer Parker's report and testimony, jail officials initially decided to release Mr. King immediately, rather than seek additional medical attention for him. The Anderson County Detention Facility Log Book indicates that he was first booked out at 4:24 p.m., while he was still in the medical office. In his report, Officer Parker recounted that he was concerned that releasing Mr. King without first taking him to a hospital would constitute deliberate indifference to Mr. King's plight. Upon Officer Parker's advice, Mr. King was rebooked and an officer accompanied him to Methodist Medical Center in Oak Ridge where

_____

[8] The trial court was skeptical of portions of the cellmates' statements, as recounted by Officer Crowley. None of the cellmates testified at the trial. During the course of Officer Crowley's investigation in the immediate aftermath of the incident, Mr. King's cellmates claimed that Mr. King was being a "smart ass" and that Brandon Paul intended to search him because Paul believed that King had tobacco on his person that he was not sharing. They also claimed that Mr. King bared his posterior voluntarily. Mr. Paul claimed that Mr. King swung at him first.

he received treatment for his injuries. Mr. King was booked out for a second time and released from custody at 4:55 p.m., while he was at the hospital, according to Anderson County records.

As a result of the assault he suffered while in the custody of Anderson County, Mr. King suffered a fractured nose and severe damage to his right eye that required surgery. Mr. King has permanent double vision as a result of the assault, which can only be partially corrected with special prismatic glasses.

At trial both sides presented expert testimony concerning the Anderson County Detention Facility, its classification system, and the timing of Mr. King's release. Mr. King called as his expert witness Mr. Robert Powell, a former Director of the Division of Local Facilities[9] for the state of Kentucky, who is currently a criminal justice consultant. Mr. Powell had never before been qualified as an expert witness in court. Mr. Powell testified that Anderson County was negligent in its classification, housing, and supervision of Mr. King, and that these acts "proximately and legally caused" Mr. King's injuries.

Mr. Powell testified that the Anderson County Detention facility was at fault for classifying Mr. King as medium security because it did not follow its classification policy as written. Mr. Powell pointed out that, while Mr. King may have talked back to Officer Faircloth, he was not charged with resisting arrest or assault. According to Mr. Powell, backtalk and non-cooperativeness are "not a basis to classify anybody," and are "not a risk factor in most jails that I know of," given that there are often conflicts between arresting officers and prisoners coming into jails and that this confrontation was a "one-time incident." Once the arresting officer leaves, Mr. Powell noted, the prisoner often calms down and "usually that's history and it's no longer a factor." Based upon previous testimony regarding Mr. King's classification process, Mr. Powell opined that Mr. King "wasn't classified at all," since "none of the factors that's listed in their policy appear to [have gone] into play" in Mr. King's classification. He also noted that there was no written record of inmate classifications in the Anderson County Detention Facility, apart from the booking sheet, although he admitted that Tennessee does not require such a classification form, nor does Policy 4.03 refer to such a form. He observed that Mr. King had no previous institutional history of behavioral problems, and thus was "textbook minimum custody." Only if there were documented proof that Mr. King had been "aggressive and physically assaulted someone while he was incarcerated" could he be classified as medium security, he concluded. Moreover, Mr. Powell

---

[9] Kentucky's Division of Local Facilities is the governmental entity responsible for overseeing the Kentucky jail system.

testified, even if Mr. King were classified as medium security, he should not have been housed with violent felony offenders.[10]

Mr. Powell also testified regarding Anderson County Detention Facility's status as a "direct supervision" facility. According to Mr. Powell, although Anderson County self-identified as a direct supervision facility and was therefore listed as a direct supervision facility in the Direct Supervision 2006 Jails Source Book,[11] and despite the fact that the physical plant was designed as such, in practice officers assigned to the pods lacked the kind of "continuous contact with inmates" that is typical of a true direct supervision facility. Instead, the officer sat at a desk in the pod where he had no direct view of the inmates, who were housed in their cells most of the day. When inmates were in their cells, they could only be observed, presumably, through a small window in the door.[12] In Mr. King's case, Mr. Powell noted, the officer in the pod was notified by the control room that an incident had occurred, rather than being the first to discover it. According to his reading of jail officials' reports, Mr. Powell surmised that one of the inmates from inside the pod or cell called the control room to indicate that Mr. King had been injured.

Mr. Powell also testified regarding Mr. King's release and jail culture generally. Regarding Mr. King's release, Mr. Powell said, "I just can't understand why it took that long to process him out," given that Ms. McCloud apparently said she would be over around 2:00 to 2:30 p.m. He noted that many things were "done wrong" in Mr. King's case, and that his release took longer than usual in part because of the "extra work" associated with classifying Mr. King and placing him in "the living area of the jail." Many jails in Kentucky and elsewhere, he observed, would not even classify inmates such as Mr. King, but instead would keep them in an assessment cell near the booking area, as they were likely to be released in under twenty-four to thirty-six hours, as occurred in Mr. King's case. He found it hard to believe, however, that Mr. King would have fallen asleep in the cell when he was returned there. Mr. Powell also observed that even though inmates are advised not to discuss their charges, "in reality, I don't know if that hardly ever happens in any facility. Usually that's the first thing they want to know when somebody comes in the cell, what are you charged with." Powell also confirmed that the policy is put in place in part to protect those charged with drug

---

[10] Mr. Powell also testified that Mr. Paul was properly classified as medium security, although his Statement of Opinion for Mr. King's federal case states that Mr. Paul could even have been maximum security.

[11] The Source Book is published by the U.S. Department of Justice, National Institute of Corrections.

[12] Mr. Powell testified based on his knowledge of similarly constructed jails, as he did not have the opportunity to visit the Anderson County Detention Facility in person.

offenses from being searched for drugs. Even so, he conceded, "fights can occur even if [inmates are] supervised and classified properly."

Anderson County's expert witness, Charles Fisher, a former court-appointed special master for multiple Tennessee jails and Assistant Director with the Tennessee Corrections Institute, currently a consultant with the Hardin County Jail, testified that Anderson County was not negligent in its classification of Mr. King. Mr. Fisher observed that Mr. King was properly classified as a "1" for "pretrial misdemeanant" and then appropriately housed with the medium security "general population," based upon his charge, interactions with the arresting officer, and his presumed behavior on his "previous trips to the jail."[13] Mr. Fisher testified that Mr. Paul also was properly classified as medium security given his institutional behavior and despite the seriousness of his charged offense. Mr. Fisher believed that both Mr. King and Mr. Paul were properly classified, given that "they had been in the place many times according to their booking sheets" and therefore the "jail knew who they were" and they "had not caused any problems before."[14] Mr. Fisher also testified that it was proper to consider "interaction with the arresting officer" when an inmate is being classified, and that "everything is on the table" for purposes of determining classification. Based on his classification, Mr. King "was eligible to be placed anywhere in the institution where it was appropriate," that is, "in any place where he did not have an enemy, where he had direct supervision and where there's no reason to believe anything would happen to him."

Mr. Fisher also testified that Anderson County had not been negligent in housing Mr. King, and that it was not foreseeable that Mr. King would be injured as a result of his housing. Mr. Fisher testified that it was clear and "not even arguable" that Anderson County was a direct supervision facility, based on the inmates' schedule, the physical arrangement of the building into direct supervision pods, and the placement of an officer inside the housing unit.[15] He noted that direct supervision is the safest possible kind of supervision, and that the

---

[13] Mr. Fisher noted that Anderson County Detention Facility has an additional layer of classification, in which "1" indicates a pre-trial misdemeanant, "2" a pre-trial felon, "3" a post-trial misdemeanant, and "4" a post-trial felon. Therefore the "1" on Mr. King's booking sheet did not indicate minimum security, but rather his trial status.

[14] Mr. King had been booked on two previous occasions, although Mr. Fisher may have been under the impression that he had more than two previous bookings.

[15] He also admitted, though, that when the inmates were in their cells, they were not visible to the police officer in the pod, and later confirmed that jail records indicated that inmates were in their cells for all but four hours a day. He also confirmed under cross-examination that when inmates were sleeping on the floor, there were likely "severe problems with classification," presumably because the last inmates admitted might be assigned to the unit with available space rather than the unit most appropriate for their level of classification.

Anderson County Detention Facility was one of the few in the state to qualify as such. Precisely because Anderson County was a direct supervision facility, Mr. Fisher testified, they could mix inmates charged with non-violent misdemeanors and those charged with violent felony offenses, as long as those inmates were known to jail officials. In a county jail, he pointed out, there is usually just general population and maximum security, and this practice of keeping a range of different offenders in general population is safe as long as there is direct supervision.

Mr. Fisher offered several opinions that addressed the unforeseeability of Mr. King's assault and injuries, given his classification and supervision. Reviewing jail memos and records, Mr. Fisher confirmed that there had been only three incidents in the past five years at the Anderson County Detention Facility that required additional medical attention, and that there had been twenty-four fights in 2007, thirty-seven fights in 2008, and thirty fights in 2009. He did not find the number of fights to be out of the ordinary, given the number of inmates housed there. The evidence suggested to him that "the place is pretty safe," despite a "blip" in 2008. Mr. Fisher emphasized that it was not foreseeable that any injury would occur to Mr. King as a result of being classified and housed as he had been. Neither Mr. King nor Mr. Paul had "caused any problems before and there was really no reason not to house them together."[16] He continued, "[t]here was no reason to believe . . . that anything would happen by putting Mr. King in that cell," noting that nothing had happened to him there during the eight hours he had spent there the previous night. It was only after Mr. King went to court that "for some reason something happened," an event he described as a "spur of the moment assault that nobody sees coming." However, Mr. Fisher confirmed that if other inmates knew that Mr. King had drugs, given that "maybe 100 percent" of inmates have some kind of drug and alcohol problem, "they're going to take them from [him]." Mr. Fisher also disbelieved Mr. King's initial story that he had fallen asleep upon being returned to his cell after his arraignment hearing. "In jail, sometimes bad things happen," he pointed out.

Regarding the timing of Mr. King's release, Mr. Fisher stated that the delay was "[t]oo long, I just don't know what was going—it seems long to me." In his deposition, Mr. Fisher had also stated that "people in the [criminal justice] system want[] to make [release from jail] as difficult as possible," and that they "don't care whether you get out or not." Finally, Mr. Fisher testified that if Mr. King had been hurt while in Anderson County custody, his medical treatment should be paid for: "You break it, you own it. That's the way I've always looked at it."

---

[16] Mr. Fisher testified that he believed that Mr. King had spent over a year in jail previously, although this belief was incorrect. He was also initially under the impression that Mr. King had been picked up on a bench warrant, rather than as the result of a traffic stop.

Following a bench trial, the trial court made extensive and detailed findings[17] that culminated in a determination that while Anderson County was not negligent in its classification or housing of Mr. King or in its supervision of inmates, it was negligent in its failure to release Mr. King in a timely manner.[18] The trial court found that Mr. King had been properly classified, and that it was proper to take into account "how a defendant responds to an authority figure" when classifying inmates. It also found that Anderson County's classification policy conformed to State standards. Basing its conclusions on the expert testimony presented in the case and favoring the testimony of Anderson County's expert, Mr. Fisher,[19] because of his extensive experience in Tennessee, the court concluded that even though it found Anderson County's Detention Facility to be a direct supervision facility and thus better monitored than most, "fights can occur even if [inmates are] supervised and classified properly," precisely because "jails are [] dangerous place[s]."

The trial court made extensive findings regarding Mr. King's credibility, generally finding him not to be credible on several key instances of testimony. The trial court found Mr. King to have been less than credible in his interactions with arresting Officer Faircloth, suggesting to the officer that he had no recent tickets when he had been cited only a few months prior to the stop. Mr. King was also found to be not credible regarding his injuries, complaining that both eyes were injured when the physical evidence and jail nurse's report reflected injury primarily to the right eye and nose. Mr. King was further found to have been less than truthful with an examining physician, claiming to have had no prior eye injuries when in fact he had two prior injuries to his eyes that had required surgery.

Most significantly, the court found that Mr. King was inconsistent in his testimony regarding the impetus for the assault, at first insisting that he did not know what provoked his cellmates and denying that he ever mentioned drugs to them, but later admitting to telling them that he had medication taken from him when he was arrested. The court found that Mr. King

---

[17] As the court's findings regarding classification and supervision are not at issue here, our recitation includes primarily the trial court's findings regarding Mr. King's untimely release, prefaced by its discussion of the credibility of the witnesses, primarily Mr. King.

[18] Neither in the Court of Appeals nor before this Court has Mr. King appealed the trial court's finding that he was appropriately classified and housed by the Anderson County Detention Facility. "Appellate review is generally limited to the issues that have been presented for review." Hodge v. Craig, 382 S.W.3d 325, 334 (Tenn. 2012). Because the parties have not addressed the issue of Anderson County's negligence in classifying and housing Mr. King, we deem that issue to be waived. At oral argument, Mr. King's counsel attempted to argue that Anderson County breached its duty to properly classify Mr. King and appropriately supervise its inmates, but those issues are not raised in the briefs and are not before us now.

[19] The trial court found Mr. Fisher's testimony to be more credible based upon his publication history, experience as a special master, and appointment as a jail expert by a federal judge.

had told his cellmates about a potential drug charge on the night he arrived, and that this was a "contributing factor" to the "spur of the moment" assault. The trial court also did not find Mr. King's assertion that he fell asleep after his return to his cell to be credible. Instead, the trial court found that Mr. King was "mad" about being returned to the cell rather than being released, and "went off" at and "cussed" Mr. Paul, saying that he "didn't give an F what he thought," noting that "that's exactly the same reaction [he] had with Faircloth." The court found that Mr. King's attitude during this interaction was akin to instigating a fight. Neither Mr. King nor his cellmates, the court found, had any history of institutional problems, which is the primary indicator of future incidents.

Citing Mr. Fisher's testimony that the delay in Mr. King's release of three hours and forty five minutes was too long, the court observed that if Ms. McCloud had shown up "within two hours" after receiving Mr. King's paperwork by 11:30 a.m. "and of course, if Mr. King hadn't made his actions," the incident would not have occurred. The judge concluded that there were "two causes for us being here today. One is the direct action of Mr. King, one is the inaction of Terri McCloud as the pretrial release officer. . . ." The trial judge did not make a specific finding about the foreseeability of an attack. Rather, it adopted Mr. Fisher's conclusion that the attack was a "spur of the moment" occurrence, while simultaneously implying that the attack was foreseeable because Mr. King was housed with dangerous men. The court found that Mr. King suffered damages in the amount of $170,000, excluding medical bills totaling $42,317.34, and assessed 55% of the fault to the County and 45% to Mr. King. During the pendency of the case and until trial, Anderson County did not pay any of Mr. King's extensive medical bills. The trial court ordered that Mr. King's medical expenses be paid by Anderson County as the "law is clear" that the jail is responsible. The County later stipulated that it would pay Mr. King's medical expenses, pursuant to Tennessee Code Annotated section 41-4-115(a) (2010).[20]

Anderson County filed a timely notice of appeal from the judgment entered on the trial court's ruling. The Court of Appeals affirmed the trial court's judgment, finding that the evidence did not preponderate against its finding that Anderson County had breached its duty in failing to release Mr. King and that an apportionment of 55% of the fault to Anderson County was appropriate. King v. Anderson County, No. E2012-00386-COA-R3-CV, 2012 WL 5960838, at *5-6 (Tenn. Ct. App. Nov. 29, 2012). In so holding, the Court of Appeals added its own specific finding that "the evidence preponderates in favor of a finding that [Mr. King's] injury was reasonably foreseeable" as a result of being left "in the cell with dangerous men an

[20] The statute mandates that "[t]he county legislative bodies alone have the power, and it is their duty, to provide medical attendance for all prisoners confined in the jail in their respective counties." T.C.A. § 41-4-115(a) (2010).

-13-

unreasonable amount of time after the release order was given," and therefore proximate cause sufficed to link Anderson County's breach of its duty to Mr. King's injuries.  Id. at *5.

We granted Anderson County's Tennessee Rule of Appellate Procedure 11 application for permission to appeal.

## II.  Standard of Review

In a civil case heard without a jury, the trial court's findings of fact are presumed to be correct, unless the preponderance of the evidence is otherwise.  Tenn. R. App. P. 13(d); Hughes v. Metro. Gov't of Nashville and Davidson Cnty., 340 S.W.3d 352, 359-60 (Tenn. 2011). Proximate causation is a question of fact; therefore we will determine whether the evidence preponderates against the trial court's finding of proximate cause.  See Wilson v. Americare Sys., Inc., 397 S.W.3d 552, 559 (Tenn. 2013).  This Court gives great weight to a trial court's findings that are predicated upon a determination of credibility.  Id. at 360.  Precisely because the trier of fact alone "had the opportunity to observe the witnesses' demeanor and hear in-court testimony," "considerable deference must be afforded to the trial court."  Lovlace v. Copley, 2013 WL 4773078, at *10, __ S.W.3d __ (Tenn. 2013); Morrison v. Allen, 338 S.W.3d 417, 426 (Tenn. 2011).  Appellate courts will not second-guess a trial court's credibility determinations without "clear and convincing evidence to the contrary."  Allstate Ins. Co. v. Tarrant, 363 S.W.3d 508, 515 (Tenn. 2012).

## III. Analysis

### A. Proximate Cause

To prevail on a negligence claim, a plaintiff must prove the following elements: 1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause.  Giggers, 277 S.W.3d at 364.  Once duty and breach of duty have been established, and an injury presented, the plaintiff must establish causation.

The plaintiff must prove two kinds of causation: causation in fact and proximate cause. Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993).  Both causation in fact and proximate cause must be proven by the plaintiff by a preponderance of the evidence.  Id.  Cause in fact or "actual cause" means "that the injury or harm would not have occurred 'but-for' the defendant's negligent conduct."  Id.  Cause in fact refers to the "'cause and effect relationship between the tortious conduct and the injury.'"  Id.  (quoting King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Injuries and Future Consequences*, 90 Yale L.J. 1353, 1355 n.7 (1981)).

-14-

In this appeal the courts below found that Anderson County breached its duty to timely release Mr. King, and that Mr. King suffered injury as a result. Before this Court neither party disputes those findings.[21] Similarly, neither side disputes that the failure to release Mr. King is the causation in fact of the injuries he clearly suffered. Thus, the "'ultimate issue'" and decisive point of inquiry is proximate causation.[22] McClenahan v. Cooley, 806 S.W.2d 767, 774-75 (Tenn. 1991).

Proximate cause focuses upon "whether the policy of the law will extend responsibility for that negligent conduct to the consequences that have occurred." Kilpatrick, 868 S.W.2d at 598. As this Court has stated previously, "'legal responsibility must be limited to those causes which are so closely connected with the result and are of such significance that the law is justified in imposing liability.'" Id. (quoting Doe v. Linder Const. Co., Inc., 845 S.W.2d 173, 181 (Tenn. 1992)) and quoting Prosser and Keeton, The Law of Torts 264 (5th ed. 1984)). Proximate cause is the means by which courts determine where that boundary will lie. Id. "Proximate cause puts a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendants' breach, defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct." Hale v. Ostrow, 166 S.W.3d 713, 719 (Tenn. 2005) (citing Haynes v. Hamilton Cnty., 883 S.W.2d 606, 612 (Tenn. 1994)). "Proof of negligence without proof of causation is nothing." Doe v. Linder Const. Co., Inc., 845 S.W.2d at 181 (quoting Drewry v. Cnty. of Obion, 619 S.W.2d 397, 398 (Tenn. Ct. App. 1981)).

In Tennessee, courts use a three-pronged test to assess proximate cause:

1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and 3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

Hale, 166 S.W.3d 713, 719 (citing Haynes, 883 S.W.2d at 612).

---

[21] Anderson County's Statement of Issue #1 is phrased in terms of the findings of both negligence and proximate cause, however, its entire argument addresses only the foreseeability prong of the proximate cause test.

[22] Even if the parties agreed that a misclassification of Mr. King was the causation in fact of his injuries, our subsequent analysis of proximate causation and the outcome of our inquiry would be the same.

The first and second requirements of the proximate cause analysis have received little attention by the parties in this case; nevertheless, we will address briefly these components of the test.

*1. Substantial Factor*

The first requirement is that the defendant's conduct be a "'substantial factor' in bringing about the harm complained of." Wilson, 397 S.W.3d at 558. Such determinations tend to be extremely fact dependent and are reviewed on a case-by-case basis. Here, as the trial court found, the behavior of both Mr. King and Anderson County were causes of the assault. There are "two causes for us being here today," the judge concluded, "one is the direct action of Mr. King, one is the inaction of Terri McCloud as the pretrial release officer." If Ms. McCloud had shown up "within two hours" after receiving Mr. King's paperwork by 11:30 a.m. "and of course, if Mr. King hadn't made his actions," the incident would not have occurred. Given these findings, we cannot say that Anderson County's actions were not a substantial factor in causing Mr. King's injuries; the evidence does not preponderate against the trial court's findings on this issue.

*2. Policy Considerations*

The second factor in the proximate cause analysis is whether there is any rule or policy consideration which should limit liability in situations of this nature. Proximate cause is the legal means of enforcing policy decisions limiting liability. Hale,166 S.W.3d at 718-19. As Tennessee courts have stated in the past, jails are not insurers of inmate safety, a rule that effectuates the courts' understanding of Tennessee's public policy. Gillespie v. Metro. Gov't, No. 01A01-9109-CV-00317,1992 WL 9441, at *1 (Tenn. Ct. App. Jan. 24, 1992). See also Harvey v. Dickson Cnty., No. M2007-01793-COA-R3-CV, 2008 WL 2165958, at *1 (Tenn. Ct. App. Feb. 5, 2008); Kinningham v. State, No. M2001-00495-COA-R3-CV, 2001 WL 1089501, at *2 (Tenn. Ct. App. Sept. 18, 2001); Hanks v. State, No. 02A01-9810-BC-00295,1999 WL 454459, at *3 (Tenn. Ct. App. July 2, 1999); Cockrum v. State, 843 S.W.2d 433, 438 (Tenn. Ct. App. 1992); See also Cupples v. State, 861 P.2d 1360, 1369 (Kan. Ct. App. 1993); Parker v. State, 282 So. 2d 483, 486 (La. 1973); Cooney v. Hooks, 535 N.W.2d 609, 611 (Minn. 1995); Butler ex rel. Biller v. Bayer, 168 P.3d 1055, 1064 (Nev. 2007); Sanchez v. State, 784 N.E.2d 675, 678 (N.Y. 2002); Harrison v. Ohio Dept. of Rehab. And Corr., 90 Ohio Misc.2d 32, 39 (Ct. of Cl. 1997); Saunders v. State, 446 A.2d 748, 751 (R.I. 1982). To hold otherwise would be to suggest that jails and prisons are in effect strictly liable for all inmate injuries incurred while in custody, a position that would be untenable in practice. See Butler ex rel. Biller , 168 P.3d at 1064 (rejecting a conception of foreseeability that includes "constructive notice" of "unspecified potential violence"); Sanchez, 784 N.E.2d at 685 (Graffeo, J., dissenting) (arguing that the state "should be liable in tort only when it fails to appropriately address unreasonable risks of attack

-16-

of which it is or should be aware" in order to "avoid imposing insurer-like liability on the State for the criminal acts of inmates"). As the trial court found in this case, "jails are [] dangerous place[s]," and "fights can occur even if [inmates are] supervised and classified properly." The Minnesota Supreme Court expressed the issue aptly when it observed that "[a]lthough society, including a person detained in jail, is entitled to expect vigilance on the part of the jailer to maintain order in the jail and to protect the detainee from assault, neither society nor the detainee is entitled to expect prescience." Cooney, 535 N.W.2d 609, 612. Given the widespread recognition of the rule that jails cannot be insurers of inmate safety, the evidence preponderates against the trial court's finding that the second prong of the proximate cause test is satisfied.

### 3. Foreseeability

The critical factor in distinguishing between vigilance and prescience is foreseeability, the third element in the proximate cause analysis. The primary focus of both parties in this case has been the issue of foreseeability in the context of the proximate cause test. Foreseeability is the crucial factor in the proximate cause test because, if the injury that gives rise to a negligence case could not have been reasonably foreseen, there is no proximate cause and thus no liability despite the existence of negligent conduct. Rathnow v. Knox Cnty., 209 S.W.3d 629, 633-34 (Tenn. Ct. App. 2006) (citing Ray Carter, Inc. v. Edwards, 436 S.W.2d 864, 867 (Tenn. 1969)). "A risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable." Downs ex rel. Downs v. Bush, 263 S.W.3d 812, 820 (Tenn. 2008) (citing West v. E. Tenn. Pioneer Oil Co., 172 S.W.3d 545, 551 (Tenn. 2005)); Doe v. Linder Const. Co., 845 S.W.2d at 178. However, "[t]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility." West, 172 S.W.3d at 551 (citing Tedder v. Raskin, 728 S.W.2d 343, 348 (Tenn. Ct. App. 1987)); Doe, 845 S.W.2d at 178. Foreseeability must be determined as of the time of the acts or omissions claimed to be negligent. Doe, 845 S.W.2d at 178.

The Court of Appeals has held that an inmate-on-inmate assault should be viewed as foreseeable only if "the institution's authorities knew of or had reason to anticipate an attack and did not use reasonable care to prevent it." Gillespie, 1992 WL 9441, at *1. In other words, to establish the proximate causation necessary to prevail in a negligence action against a penal institution for an inmate-on-inmate assault, the institution must have "had prior notice of an attack." Id.[23] See e.g. Harvey, 2008 WL 2165958, at *1; Kinningham, 2001 WL 1089501, at *2; Hanks, 1999 WL 454459, at *3; see also Saunders, 446 A.2d at 751 (holding that the prior notice

_____

[23] The Court of Appeals in Gillespie cited Harris v. State, 297 A.2d 561, 563 (N.J. 1972), for the rule that prison officials would have to have "prior warning" or have been "made aware of any circumstances calling for special precautions on their part" to be liable for negligence in cases of inmate-on-inmate attacks.

rule is, in effect, a more specific application of the general rule of foreseeability, requiring, for example, knowledge that an inmate's dangerous propensities were likely to lead to an attack on a specific victim or group of victims).

For purposes of assessing a penal institution's liability, prior notice can be actual or constructive. Such notice may arise from knowledge of specific threats to a specific inmate or group of inmates from another individual or group of individuals, or an inmate's prior institutional history of violent–including self-destructive or suicidal–behavior, or any other specific information or conditions that would provide prison officials with actual or constructive notice of foreseeable harm to specific individuals or groups of persons. As the Supreme Court of Nevada has held more recently, "[h]arm is foreseeable when prison officials actually know that an inmate is at risk, that the attacking inmate is dangerous, or when prison officials otherwise have reason to anticipate the attack." Butler ex. rel Biller, 168 P.3d at 1058; see also Cooney, 535 N.W.2d 609, 612; Sanchez, 784 N.E.2d at 685 (Graffeo, J., dissenting) (foreseeability defined by actual and constructive notice, including but not limited to knowledge that the victim was at risk of assault, the assailant was known to be dangerous, the State was aware of an attack but failed to intervene, prior attacks occurred regularly in a certain location in a facility, or the State received threats or was aware or should have been aware of unrest prior to a specific event that culminated in violence); Harrison, 90 Ohio Misc. 2d at 40 (holding no liability for negligence exists in a prison setting where there is no "adequate notice" of an impending assault, including "notice of an imminent threat of harm" to specific individuals). But see Sanchez, 784 N.E.2d at 679-80 (holding that constructive notice includes what the State "should have known–for example, from its knowledge of risks to a class of inmates based on the institution's expertise or prior experience, or from its own policies and practices designed to address such risks").

As noted earlier, courts in Tennessee and in other jurisdictions have long and consistently held that as a matter of public policy, "penal institutions are not insurers of an inmate's safety." Cockrum, 843 S.W.2d at 438. See Harvey, 2008 WL 2165958, at *1; Kinningham, 2001 WL 1089501, at *2; Hanks, 1999 WL 454459, at *3; Gillespie, 1992 WL 9441, at *1; see also Cupples, 861 P.2d at 1369; Parker, 282 So. 2d at 486; Cooney, 535 N.W.2d at 611; Butler ex rel. Biller, 168 P.3d at 1064; Sanchez, 784 N.E.2d at 678; Harrison, 90 Ohio Misc.2d at 39; Saunders, 446 A.2d at 751. Accordingly, the Court of Appeals has consistently held that where a governmental entity had no prior notice of an inmate-on-inmate attack, it could not be liable for a subsequent assault. In Gillespie, for example, the Court of Appeals found that the government was not liable because it could not foresee an attack where an inmate gave only "vague and unspecified" reasons for avoiding a fellow inmate who teased him; he made no request to be moved away from that inmate, and the other inmate had no institutional history of violent behavior. Gillespie, 1992 WL 9441, at *1, *3. In Harvey, the intermediate court found that no attack was foreseeable where the inmate-plaintiff had been incarcerated for twenty-three days prior to the assault without incident, had not previously considered his assailant to be a threat to his safety, had never told anyone that

he felt threatened by his attacker, and the attacker had no institutional history of violence. Harvey, 2008 WL 2165958, at *4. Similarly, in Kinningham, the State was not liable where the inmate-plaintiff had been on friendly terms with his attacker and did not expect the sudden attack. Kinningham, 2001 WL 1089501, at *3. In Hanks, where the plaintiff was housed in a facility containing only minimum custody level inmates, the state could not have been on notice of any threat of harm where the plaintiff and his attacker had had verbal disagreements but never physical altercations, the plaintiff never complained about his attacker to prison officials or sought protective custody, and the assailant had no record of institutional violence. Hanks, 1999 WL 454459, at *1, *4.

In this case, there is no evidence that Anderson County Detention Facility officials knew or should have known that Mr. King would become the victim of an attack by his cellmates after he was returned to his cell to await pretrial release. Mr. King had spent eight hours in the same cell, with the same detainees, during the previous night without incident, even though he had at that time informed his cellmates that drugs had been taken from him by police when he was arrested. He did not report any attempt to search him at that time, nor did Mr. King ever complain to prison authorities that he felt threatened by any of his cellmates. Mr. King's alleged assailant, Mr. Paul, had no record of institutional violence, despite the fact that he had been in custody since July of that year. Although it is understandable that Mr. King would be upset about his delayed release, it was not foreseeable or probable that he would choose to curse or "[go] off" at a cellmate after returning to his cell, especially given his own admission that he had felt "scared" of his fellow inmates upon entering the cell for the first time. West, 172 S.W.3d at 551. As the trial court itself observed, Mr. King was the victim of a "spur of the moment assault" of which no one had any notice.[24] No prison official could have predicted the assault, especially given the lack of any incident or threat during Mr. King's previous night in the same company. Because the record contains no proof that the prison officials knew of or had reason to anticipate an attack on Mr. King, we conclude that the evidence preponderates against the trial court's finding of foreseeability and, therefore, that proximate cause cannot be established in this case.

There is no doubt that Mr. King suffered serious injuries during his time in the Anderson County jail, and this Court in no way condones this painful, debilitating, and traumatizing attack. Even so, we are compelled to follow the logic of the law in assessing liability. Thus, we must conclude that although the assault upon Mr. King was a possibility, given that penal institutions house dangerous people convicted or charged with crimes, sometimes extremely serious or violent crimes, the evidence in the record preponderates against the finding that the assault was a reasonably foreseeable probability, which is the standard for assessing proximate cause necessary

---

[24] The trial court's finding that the assault on Mr. King was a "spur of the moment" event is applicable to all aspects of our analysis of this case, as the trial court did not indicate that this finding was restricted to any one issue.

to impose liability in a negligence case. Because the evidence preponderates against the trial court's findings regarding the second and third prongs of the proximate cause analysis, Mr. King has not proven proximate cause, and the judgment in his favor must be reversed.

## *B. Damages*

Our holding that Anderson County cannot be held liable for the injury to Mr. King pretermits Anderson County's appeal of the trial court's and Court of Appeals' holdings regarding apportionment of fault. However, our holding in no way absolves Anderson County of its statutory responsibility to pay for the medical bills Mr. King incurred as a result of the injuries he suffered while in custody. See Tenn. Code Ann. § 41-4-115(a). That obligation remains.

## IV. Conclusion

The evidence preponderates against the trial court's and Court of Appeals' finding that Anderson County's negligence was the proximate cause of Mr. King's injuries, and therefore their finding is reversed. Because the jail had no prior notice that an attack on Mr. King was a reasonably foreseeable probability, Anderson County is not liable. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded to the trial court for dismissal. The trial court's order directing Anderson County to pay all of the medical bills Mr. King incurred as a result of this incident as required by statute is affirmed.

In the interests of justice, the costs of this cause are taxed to Defendant, Anderson County, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE