IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 18, 2016 Session


# LINDSAY MEGHAN CRUTCHFIELD v. STATE OF TENNESSEE

**Appeal from the Tennessee Claims Commission**
**No. T201208501      Commissioner, Robert N. Hibbett**

_____

**No. M2015-01199-COA-R3-CV – Filed April 18, 2016**
_____


A hearing-impaired student attending a state university was required to live in a dormitory on campus. The university installed a bed shaker and strobe light in the student's room that would be triggered by the presence of smoke or by a doorbell installed outside the room. The student's room also had a speaker above the door that was wired into the building's fire alarm system that sounded an alarm if the dormitory's fire alarm was activated. On a morning in September 2011, the speaker in the student's room that was located above the door was activated in response to a false alarm in the dormitory. Believing the sound caused her to suffer further hearing loss, the student sued the State, arguing the State was negligent by subjecting her to the loud alarm. The case was tried by the Tennessee Claims Commission, which found the State liable for the student's further hearing impairment. The State appealed, and we reverse, holding the student failed to prove proximate cause.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Tennessee Claims Commission Reversed and Vacated**

ANDY D. BENNETT, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Herbert H. Slatery, III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; and Joseph Ahillen, Assistant Attorney General; for the appellant, State of Tennessee.

Malcolm L. McCune and Mathew Zenner, Brentwood, Tennessee, and William A. Cameron, Cookeville, Tennessee, for the appellee, Lindsay Megan Crutchfield.

# OPINION

## I. FACTUAL BACKGROUND

Lindsay Megan Crutchfield was a first-year student at Tennessee Technological University ("TTU") in the fall of 2011. Ms. Crutchfield was hearing impaired, and she sought permission to live off campus during her freshman year. TTU denied this request. Ms. Crutchfield went to the offices of the university's disability services and housing services to alert them of her disability, and TTU informed Ms. Crutchfield that it would make special arrangements to accommodate her impairment. Before moving onto campus, Ms. Crutchfield had a hearing loss of approximately 50% in her right ear and a loss of approximately 75% in her left ear.

In an effort to accommodate Ms. Crutchfield's hearing impairment, TTU provided her with a single room in Jobe Hall, near the elevator, and it installed a supplemental alarm system in her dormitory room. The supplemental system was made by SilentCall Communications and consisted of a strobe light and bed shaker that were triggered when a doorbell located outside of Ms. Crutchfield's room was pushed or when smoke was detected by a smoke detector. If smoke were detected, a high pitch alarm would sound in addition to the strobe light and bed shaker. The auxiliary smoke detector and alarm that were part of the SilentCall system were mounted on the wall above Ms. Crutchfield's bed. The strobe light and bed shaker could be inactivated by unplugging the electrical cord from the socket in the wall in Ms. Crutchfield's dormitory room.[1] In addition to the SilentCall system, Ms. Crutchfield's room was outfitted with a speaker above her door that was part of the dormitory-wide fire alarm system. The evidence showed that each dormitory room has the same type of speaker situated above the door that sounds an alarm in the event of a triggering event such as a fire or fire drill. The dormitory-wide alarm system was not tied in with the SilentCall system, so the bed shaker and strobe light would not be activated by the dormitory-wide fire alarm system.

On the morning of September 30, 2011, Ms. Crutchfield was sleeping in the bed of her dormitory room when she woke up at about 6:15 to what she described as "a high-decibel pitch going off." Ms. Crutchfield did not know what was going on or why an alarm was sounding. When she looked into the hallway and did not see anyone, she noticed a light above the hall leading to more dormitory rooms and hurried to get outside to find out what was happening. Ms. Crutchfield testified that she managed to get outside

---

[1]Ms. Crutchfield testified that other students walking by her door often pushed the doorbell that activated the strobe light and bed shaker, which was annoying to her. Ms. Crutchfield testified that she unplugged the SilentCall system at night because she knew "it would be a continuous issue throughout the night" if she left it plugged in.

within a minute or so of waking up to the high-pitched sound. Evidence was introduced that the building-wide fire alarm began sounding at 6:00, fifteen minutes before Ms. Crutchfield woke up. She was asked why she did not hear the alarm before 6:15, and Ms. Crutchfield answered:

> I think, when I was asleep, I was laying on my right side and I was laying on my good ear, what I considered it, because I just - - I remember waking up on my left side and I think that I might have rolled over, and that's when it woke me, when I rolled over and heard it out of my right ear.

Ms. Crutchfield testified that the sound from the alarm was painful and caused her ears to feel "piercing pain." She believed the alarm was emanating from the smoke detector that was located near her bed rather than the speaker over her door. However, Ms. Crutchfield testified that there was no smoke in her room, and the evidence was undisputed that smoke is the only trigger for the alarm near her bed that is part of the SilentCall system. Upon exiting Jobe Hall, Ms. Crutchfield found Erica Hunt, who was in charge of the dormitory's resident assistants, to find out why the alarm was ringing. Ms. Crutchfield testified that she was unable to hear anything Ms. Hunt was saying to her because her ears "were constantly ringing."

The evidence showed that the fire alarm went off in Jobe Hall spontaneously, for no apparent reason, because it had not been reset properly following a fire drill earlier in the semester. Ms. Hunt testified that the fire alarm "was not a response to a threat of fire."

Ms. Crutchfield has had increased difficulty hearing ever since the sounding of the alarm in her room on September 30, 2011. Ms. Crutchfield went to see her otolaryngologist, Dr. William H. Merwin, five days later, and Dr. Merwin determined that her eardrums were intact but that she was having problems communicating. Dr. Merwin testified,

> I was having to frequently repeat and she was basically having to read my lips. But we were having a great deal of difficulty communicating with her. When I would speak to her, she would give me a blank stare: "I don't know what you're saying."

Dr. Merwin explained that Ms. Crutchfield did not normally interact with him like that. On October 5, Dr. Merwin determined that Ms. Crutchfield's hearing "had gotten much worse and that it was a noise-induced type of injury." Dr. Merwin testified that Ms. Crutchfield's hearing loss was worsened by the fire alarm on September 30. When asked how the injury occurred, Dr. Merwin responded:

- 3 -

Basically the hair cells, which are the inner ear hearing nerves, can only tolerate so much sound, and after that, they start to break down and lose . . . function. Typically you get some temporary worsening of hearing after a loud noise exposure, and then it improves, what we call a temporary threshold shift, but that should resolve within a few days. And then after that you're left with the permanent portion of the hearing impairment.

When she went to see Dr. Merwin, Ms. Crutchfield was under the impression that the alarm that she found so painful on September 30 was emanating from the alarm connected to the smoke detector in her room, which was near her head above her bed, rather than from the alarm positioned over her door. Dr. Merwin confirmed that this is what Ms. Crutchfield told him when she went to see him on October 5:

Q:      In your history did Lindsay tell you that the alarm was right above her head on the bed?

A:      Yes.

Q:      And had that been on the adjoining wall or somewhere away from where her head was where she was, you know, sleeping, would that have helped protect her from this damage?

A:      Some, yes.

Q:      And could that have prevented her from having additional hearing loss had it been installed - -

A:      Yes.

Q:      - - at a place other than right next to her ears?

A:      Yes.

Dr. Merwin was asked whether Ms. Crutchfield was more susceptible to harm from loud noises than someone who was not hearing impaired:

Q:      Is there any relatedness, you think, between her prior hearing impairments and the damage that was shown after the incident with the fire alarm?

A:      She may have been slightly more susceptible to noise as a result of her existing hearing loss. That's offset by the fact that the hearing loss has

- 4 -

a somewhat protective effect against noise damage. Because the noise has to be louder to actually affect the nerves. It has to overcome the hearing loss before it can cause damage.

Q:      Okay. So it would actually have to be louder than for a normal person to sustain hearing damage?

A:      Yes. I'm saying that's offsetting the fact that she may have been more susceptible.

Q:      And why would she be more susceptible?

A:      Because she already had some nerve damage.

Dr. Merwin was then asked whether it was possible for someone to sleep through a sound that is loud enough to cause damage to their ears, and he responded, "It's not likely. It's not likely."

Dr. Merwin stated that by August 10, 2012, Ms. Crutchfield's hearing had stabilized and that he conducted a hearing test on her that day. The results showed that Ms. Crutchfield had a 90 decibel loss in her right ear and an 85 decibel loss in her left ear. Dr. Merwin explained that a 90 decibel loss was "severe to what we could call profound loss." He continued that an 85 decibel loss was also considered severe. According to Dr. Merwin, Ms. Crutchfield has permanent sensorinueral hearing loss in both ears and is essentially deaf without hearing aids. With the help of hearing aids, Dr. Merwin testified that Ms. Crutchfield should be able to get within 10 to 20 decibels of normal, and possibly into the normal range of hearing.

## II. PROCEDURAL BACKGROUND

Ms. Crutchfield filed a claim for negligence against TTU and the State of Tennessee with the State of Tennessee Division of Claims Administration on January 23, 2012. She alleged that the special fire alarm system that was installed in her room was not installed or maintained properly, and that as a result, "extremely high decibel values were emitted and caused permanent and disabling damage" to her hearing. Ms. Crutchfield asserted that she suffers from permanent and total hearing loss as a result of TTU's negligence. Ms. Crutchfield further alleged that TTU "fail[ed] to follow protocol of assisting disabled residents during an emergency actual or perceived," which resulted in her exposure to the excessively loud noise for more than fifteen minutes before she removed herself from the building. Ms. Crutchfield sought damages of $1,000,000 for her injuries, medical expenses, and other related expenses. The Division of Claims Administration transferred the case to the Claims Commission in April 2012 pursuant to

Tenn. Code Ann. § 9-8-402(c), and a one-day trial was held before a claims commissioner on December 11, 2014.

In addition to the evidence described above, Jim Cobb, who was the Director of Capital Projects and Environmental Health and Safety, testified about the alarm system in Jobe Hall. He explained that all dormitory rooms have detectors with sounder bases in them that are located above the doors. When a building fire alarm is activated, speakers in the hallways provide a pre-recorded message to evacuate the building, and the sounder bases in the individual dormitory rooms are activated and sound "a horn or a buzzer type of alarm." Mr. Cobb was asked about the decibel level of the alarms in the dormitory rooms:

Q:      What controls the volume of the alarm?

A:      . . . The sounds on the sounder bases that is with the detectors in the sleeping rooms is fixed. It's pre-set. There is no adjustment.

Q:      So the sound - -

A:      They are what they are when they come to us.

Q:      So the sound in each room from the sounder base is fixed.

A:      That's correct.

Q:      And when you use the word "fixed," I assume somewhere the volume can be changed. Am I wrong in that or . . .

A:      Well, to my knowledge, they can't be changed by us in the field. I'm assuming that, you know, that's got something to do with the manufacturer of the device. To my knowledge, there is no variation.

Q:      Is the volume that goes into the dormitory rooms, is that set by any type of regulation?

A:      There is the code, which is the NFPA Code 72, which is the fire alarm code, and NFPA is the National Fire Protection Association. That's the code we're under, being a state facility. It sets the decibel level at the pillow at 75 decibels, at the pillow for sleeping rooms.

Q:      To your knowledge, is Tennessee Tech in compliance with those codes?

- 6 -

A:     To my knowledge, we are, yes.

Mr. Cobb then explained that TTU has a contract with a third party company to test and inspect the alarm systems in the university's dormitories on an annual basis, as the applicable code requires.  No evidence was introduced to suggest the alarm in Ms. Crutchfield's room was not functioning properly.

## Claims Commissioner's Decision

The claims commissioner issued a judgment for Ms. Crutchfield on February 10, 2015.  In addition to the undisputed facts set forth above, the commissioner made findings of fact, which we summarize below:

- No evidence was introduced that any student other than Ms. Crutchfield has ever complained that the dormitory's fire alarms are too loud.

- TTU does not have a policy of checking on each student when a fire alarm sounds to make sure each student leaves the building.

- The smoke detector that was part of the SilentCall system in Ms. Crutchfield's dormitory room did not communicate with the building's fire alarm system.  The smoke detector in Ms. Crutchfield's room was connected only to the SilentCall receiver, which activated the strobe light and the bed shaker.

- Ms. Crutchfield had unplugged the SilentCall system at the time of the incident.  The smoke alarm attached to the system was not activated and made no sound during the event.

- The school fire alarm on the wall above the door in Ms. Crutchfield's room was the sole factual cause of Ms. Crutchfield's hearing loss on the morning of September 30, 2011.

- All dormitory rooms at TTU have detectors with sounder bases and all buildings are equipped with whatever is required by code.  The volume of the alarms emanating from the sounder bases in the dormitory rooms is pre-set at 75 decibels pursuant to National Fire Protection Association Code 72 and cannot be adjusted.

- The most recent audiogram Ms. Crutchfield had was on June 24, 2011, approximately three months prior to the incident on September 30, 2011, and the audiogram showed an approximate 50% hearing loss in her right ear and a 75%

hearing loss in her left ear.

- Before the injury on September 30, 2011, Ms. Crutchfield's hearing was fairly stable and she had not shown any significant deterioration of her hearing. She had some difficulty with communication, but she was able to function without hearing aids.

- Since the injury on September 30, Ms. Crutchfield has been unable to hear at all in either ear. She has permanent sensorineural hearing loss in both ears as a result of the injury at TTU. She needs hearing aids. Without hearing aids, Ms. Crutchfield is essentially deaf.

- Dr. Merwin testified that there is a 10% chance Ms. Crutchfield's hearing would have worsened if the injury had not occurred.

- According to a forensic economist expert, the estimated present value of Ms. Crutchfield's future earnings capacity loss is $1,504,189.

The claims commissioner then made conclusions of law. He explained that based on Tenn. Code Ann. § 9-8-307(c), a plaintiff in a negligence case against the State must prove (1) a duty owed to the plaintiff; (2) conduct below the applicable standard of care that amounts to a breach of that duty; (3) injury or loss; (4) cause in fact; and (5) proximate cause. Addressing first TTU's duty to Ms. Crutchfield, the claims commissioner concluded that TTU had a duty to accommodate Ms. Crutchfield's disability to protect her safety, health, and hearing once it was notified that Ms. Crutchfield was hearing impaired. The commissioner wrote that TTU was not required to foresee every possible scenario that would affect Ms. Crutchfield's health, safety, and hearing, but "it had the duty to make reasonable efforts to provide for her safety and health in light of her disability."

Turning next to whether or not TTU breached its duty, the commissioner found TTU should have connected the school's fire alarm system to the SilentCall system that was installed in Ms. Crutchfield's room. In addition, TTU should have planned for someone to physically notify Ms. Crutchfield and escort her out of the building once the fire alarm was activated. The commissioner wrote:

> It is apparent Tech had no plan to ensure the Claimant's exit in an emergency. Just because it was not Tech's policy to ensure her exit out of the building in the event of an alarm does not abrogate its duty. The Claimant was also never briefed concerning the school's fire alarm or what her actions should be in case of an emergency. It should have been reasonably foreseen that extended exposure to 75 decibels could have

caused hearing damage, which it actually did. In addition, the fire alarm should not have been activated because there was no fire or drill. Ms. Hunt admitted that she had incorrectly reset the alarm. But for her action, this event would not have taken place. Because Tech did not allow the Claimant to live off campus, it did not have a plan to immediately extricate her from the dormitory in the event of an alarm, and it had incorrectly reset the alarm, Tech breached its duty to the Claimant to reasonably provide for her health and safety in light of her disability.

The claims commissioner found that the fire alarm above Ms. Crutchfield's door was the cause in fact and proximate cause of her additional hearing loss:

The Tribunal has found that the sounding of the school fire alarm above Claimant's door was the cause of her further hearing loss. It is also the proximate cause of her further hearing loss. Dr. Merwin opined that there was only a ten percent chance that the Claimant's hearing would have worsened in [the] absence of the alarm on September 30, 2014. He opined, within a reasonable medical certainty, there were no other potential causes for her further hearing loss except for the alarm. The Tribunal also finds there are no other intervening causes, other than comparative fault, for her hearing loss. Therefore, the sounding of the fire alarm is found to be the proximate and legal cause of her further hearing loss.

The commissioner then addressed Ms. Crutchfield's comparative fault:
Just as Tech should have reasonably foreseen that extended exposure to the fire alarm could cause further hearing loss, the Claimant, having full knowledge of her own condition, should have foreseen this probability. She had the responsibility to take steps to protect her hearing. The first step she should have taken was to keep her Silent Alarm connected at all times. It is apparent that both the staff and students were aware of her doorbell that could have been activated during the alarm, and may have been. However, since the Claimant unplugged it, it was useless to the Claimant. She could have done more to put school officials on notice of her obviously fragile hearing that was super sensitive to prolonged loud noise. Furthermore, the Claimant could have worn ear protection. Because of her comparative negligence, the Claimant bears thirty percent fault for her hearing loss.

The commissioner then addressed Ms. Crutchfield's economic and non-economic damages and awarded Ms. Crutchfield $208,771.29 after taking into account Ms. Crutchfield's comparative negligence and the ten percent chance that her hearing would have deteriorated even in the absence of the injury on September 30, 2011.

The State filed a notice of appeal and argues that the claims commissioner erred in finding Ms. Crutchfield proved both proximate causation and causation in fact. *See* Tenn. Code Ann. § 9-8-403(a)(1) (decisions of individual commissioners may be appealed to Tennessee Court of Appeals). According to the State, the evidence preponderates against the commissioner's finding that it was reasonably foreseeable that the dormitory alarm would cause Ms. Crutchfield's hearing loss (proximate cause); and the evidence preponderates against the commissioner's finding of causation in fact because there was no expert medical proof that any negligent conduct by TTU was the cause of Ms. Crutchfield's injury. Ms. Crutchfield appeals the commissioner's conclusion that she was negligent in disconnecting the SilentCall system and that her award of damages should be reduced by ten percent based on the possibility that she would suffer additional hearing loss independent of the incident on September 30, 2011.

## III. ANALYSIS

The issues the State raises on appeal, whether the evidence preponderates against the claims commissioner's findings of proximate cause and causation in fact, are both questions of fact. *See King v. Anderson Cnty.*, 419 S.W.3d 232, 245 (Tenn. 2013) ("[p]roximate causation is a question of fact"); *Hale v. Ostrow*, 166 S.W.3d 713, 718 (Tenn. 2005) (stating causation in fact is question for fact finder). In cases where there is no jury, an appellate court presumes the trial court's findings of fact are correct unless the preponderance of the evidence is otherwise. TENN. R. APP. P. 13(d); *King*, 419 S.W.3d at 245. "Because of the presumption, an appellate court is bound to leave a trial court's finding of fact undisturbed unless it determines that the aggregate weight of the evidence demonstrates that a finding of fact other than the one found by the trial court is more probably true." *C-Wood Lumber Co., Inc. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 271 (Tenn. Ct. App. 2007) (citing *Parks Props. v. Maury Cnty.*, 70 S.W.3d 735, 742 (Tenn. Ct. App. 2001)). For a court to find that evidence preponderates against a trial court's finding of fact, the evidence must support another finding "with greater convincing effect." *Id.* (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000)).

Tennessee Code Annotated section 9-8-307(c) provides that: "The determination of the state's liability in tort shall be based on the traditional tort concepts of duty and the reasonably prudent person's standard of care." As the claims commissioner found, Ms. Crutchfield must prove the following elements to prevail on her negligence claim against the State:

> 1) a duty of care owed by the defendant to the plaintiff; 2) conduct falling below the applicable standard of care amounting to a breach of that duty; 3) an injury or loss; 4) causation in fact; and 5) proximate, or legal, cause.

*King*, 419 S.W.3d at 246 (citing *Giggers v. Memphis Hous. Auth.*, 277 S.W.3d 359, 364 (Tenn. 2009)). A plaintiff asserting negligence is required to prove both causation in fact and proximate cause by a preponderance of the evidence. *Id.*; *Hale*, 166 S.W.3d at 718; *Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993).

The State does not dispute that it owed a duty of care to Ms. Crutchfield as a TTU student who was required to live on campus or that Ms. Crutchfield suffered an injury or loss. The State disputes that Ms. Crutchfield established causation in fact and/or proximate cause.

Causation in fact refers to the relationship between the defendant's conduct and the injury suffered. "The defendant's conduct is the cause in fact of the plaintiff's injury if, as a factual matter, it directly contributed to the plaintiff's injury." *Hale*, 166 S.W.3d at 718. Causation in fact has also been defined to mean "'that the injury or harm would not have occurred 'but-for' the defendant's negligent conduct.'" *King*, 419 S.W.3d at 246 (quoting *Kilpatrick*, 868 S.W.2d at 598).

Proximate cause, in contrast, is based on foreseeability, and it "'puts a limit on the causal chain, such that, even though the plaintiff's injury would not have happened but for the defendants' breach, defendants will not be held liable for injuries that were not substantially caused by their conduct or were not reasonably foreseeable results of their conduct.'" *Id*. at 246-47 (quoting *Hale*, 166 S.W.3d at 719). Courts in Tennessee use a three-part test to determine whether proximate cause exists in a particular case:

> 1) the tortfeasor's conduct must have been a 'substantial factor' in bringing about the harm being complained of; and 2) there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm; and 3) the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence.

*Id*. at 247 (quoting *Hale*, 166 S.W.3d at 719).

As the State points out, "'the harm must be foreseeable from the vantage point available to the defendant at the time that the allegedly negligent conduct occurred.'" *Rathnow v. Knox Cnty.*, 209 S.W.3d 629, 633 (Tenn. Ct. App. 2006) (quoting *Wingo v. Sumner Cnty. Bd. of Educ.*, No. 01A01-9411-CV-0051, 1995 WL 241327, at *3 (Tenn. Ct. App. Apr. 26, 1995)). A plaintiff is required to show that the injury suffered was "'a reasonably foreseeable probability, not just a remote possibility, and that some action within the defendant's power more probably than not would have prevented the injury.'" *Id*. at 633-34 (quoting *Eaton v. McLain*, 891 S.W.2d 587, 594 (Tenn. 1994)). The exact

manner in which the injury occurred need not be foreseen so long as the general manner in which the injury occurred was foreseeable, or should have been foreseen through the exercise of reasonable diligence. *Id.* at 633 (quoting *McClenahan v. Cooley*, 806 S.W.2d 767, 775 (Tenn. 1991)).

The claims commissioner found that the sounding of the school fire alarm above Ms. Crutchfield's door was both the cause in fact and the proximate cause of her further hearing loss. The commissioner's conclusion that the alarm was the cause in fact of her injury is supported by Dr. Merwin's testimony that Ms. Crutchfield suffered a noise-induced type of injury. However, we find the evidence preponderates against the commissioner's finding that TTU should have known that subjecting Ms. Crutchfield to an alarm at 75 decibels would cause her to suffer additional hearing loss or any other type of injury. The evidence was undisputed that TTU was in compliance with the National Fire Protection Association's codes regarding fire alarms and that the decibel level of the alarm in Ms. Crutchfield's dormitory room was pre-set and could not be altered by TTU. Ms. Crutchfield did not introduce any evidence that she informed TTU that she was particularly susceptible to loud noises or that TTU knew, or reasonably should have known, that a hearing-impaired individual was more susceptible than a non-hearing-impaired individual to an alarm sounding at 75 decibels.[2]

As the State argues, TTU installed the SilentCall system to protect Ms. Crutchfield in the event of a fire, because her hearing impairment would prevent her from hearing the alarm sounding. It does not logically follow that she would be injured by hearing the dormitory alarm. Moreover, Dr. Merwin testified that although Ms. Crutchfield may have had a greater susceptibility to loud noises, this susceptibility was offset by her hearing impairment:

> She may have been slightly more susceptible to noise as a result of her existing hearing loss. That's offset by the fact that the hearing loss has a somewhat protective effect against noise damage. Because the noise has to be louder to actually affect the nerves. It has to overcome the hearing loss before it can cause damage.

We are very sympathetic to Ms. Crutchfield's further hearing loss, and we find the evidence does not preponderate against the commissioner's finding that her hearing was worsened as a result of the fire alarm in her room. However, the evidence preponderates

---

[2]Although it could be argued that wiring the SilentCall system TTU installed in Ms. Crutchfield's room directly to the dormitory alarm system would be a better way of notifying Ms. Crutchfield that the fire alarm had been triggered, she would not have been notified in this instance because Ms. Crutchfield testified that she unplugged the SilentCall system the prior evening. Thus, the only way Ms. Crutchfield could have known the fire alarm had been triggered was by hearing the alarm sound, as she did in this case.

against the commissioner's finding that TTU knew, or reasonably should have known, that Ms. Crutchfield was more susceptible to loud noises than non-hearing-impaired students or that it was negligent in maintaining the fire alarm above the door in her dormitory room. Ms. Crutchfield's arguments on appeal are pretermitted in light of our conclusion that her injury was not reasonably foreseeable and that the State is, therefore, not liable for her further hearing loss.

## IV. CONCLUSION

The claims commissioner's judgment is reversed and its damage award is vacated. The costs of this appeal shall be taxed against the appellee, Lindsay Megan Crutchfield, for which execution shall issue if necessary.

_____
ANDY D. BENNETT, JUDGE