IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 1, 2020

## IN RE MALACHI M.

**Appeal from the Juvenile Court for Hamilton County**
**No. 289420   Robert D. Philyaw, Judge**

_____

### No. E2020-00561-COA-R3-PT

_____

This appeal involves a petition to terminate the parental rights of a father to a minor child. The trial court found that there was clear and convincing evidence to terminate the father's rights on the ground of abandonment by an incarcerated parent and that termination was in the best interest of the child. The father appealed. We affirm the trial court's decision to terminate the father's parental rights and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded.**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and KRISTI M. DAVIS, J., joined.

Greta Locklear, Chattanooga, Tennessee, for the appellant, Albert J.

Herbert H. Slatery, III, Attorney General and Reporter, and Stephanie R. Reevers, Deputy Attorney General, for the appellee, Tennessee Department of Children's Services.

### OPINION

### I.     FACTUAL & PROCEDURAL HISTORY

Albert J.[1] ("Father") and Gabrielle M.[2] ("Mother") are the parents of Malachi M.,

---

[1] In cases involving a minor, it is this Court's policy to protect the privacy of the child by using the first name and last initial of the parties involved. *See In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

[2] Mother surrendered her parental rights on April 4, 2019. As a result, she was not a party at trial and is not a party in this appeal.

who was born in December 2013.  No father was listed on Malachi's birth certificate, but in June 2014, a DNA test determined that Father was the biological father.  Currently, Malachi is in the custody of the Tennessee Department of Children's Services ("DCS").  DCS initiated this case on July 24, 2019, by filing a petition to terminate Father's parental rights to Malachi.

In August 2016, DCS received a referral regarding Mother's care of Malachi and his two half-siblings.[3]  The referral alleged lack of supervision, environmental neglect, and medical neglect by Mother.  As a result of the referral, law enforcement and Child Protective Services investigated Mother's home.  The home was reportedly in "deplorable condition."  After the in-home investigation, Mother was arrested for child neglect, and DCS petitioned for temporary legal custody of Malachi and his half-siblings.  The next day, the trial court granted temporary legal custody of the children to DCS.  Father was incarcerated at the time of the referral, the investigation, and the grant of legal custody to DCS.  DCS was granted custody of the children and they were placed in foster care.  After a hearing on November 1, 2016, Malachi and his half-siblings were adjudicated dependent and neglected.

At trial, Father admitted to being incarcerated for a significant portion of Malachi's life.  He testified that he was incarcerated twice in 2014 and twice in 2015.  The second time he was arrested in April 2015, and as a result was incarcerated until January 10, 2017.  Three months later, in April 2017, Father was arrested for violating the terms of his probation and was incarcerated from that point through the time of the termination hearing in February 2020.  At trial, Father also had a pending criminal charge for allegedly selling a schedule II drug.

Shortly after Malachi entered DCS custody in 2016, Stacey Ridgell, the family service worker with DCS that was assigned to Malachi's case, made efforts to engage Father while he was incarcerated.  Initially, she spoke with Father on the telephone.  The parties discussed Father's family permanency plan and the criteria for termination of parental rights.  A few days later, Ms. Ridgell met with Father in-person to review the plan and criteria for termination.  Ms. Ridgell testified that she also met with Father while he was incarcerated in October 2016.  Ms. Ridgell testified that at this meeting they once again reviewed Father's responsibilities under the permanency plan and the criteria for termination of parental rights.  In regards to the criteria, she stated that they reviewed the entire document "line by line," including the section that discusses abandonment by an incarcerated parent.  At the end of the meeting, Father signed the criteria for termination and a document that listed his responsibilities under the permanency plan, but he did not sign the plan itself.[4]  Father's responsibilities under the initial permanency plan included

---

[3] Father is not a parent of Malachi's half-siblings that are discussed in this case.  The parental rights pertaining to Malachi's half-siblings are not part of this appeal.

[4] At trial, Father admitted that he signed these documents, but he claimed that he only signed them

paying child support, if ordered to do so; resolving all pending legal charges and not incurring new ones; and upon leaving incarceration, presenting himself to DCS to inform the department of his intentions as a parent. Despite the parties' meetings and Father's signatures, at trial he claimed that he was unaware that one of his "main responsibilit[ies]" was to present himself to DCS upon leaving incarceration. Ms. Ridgell stated that, to ensure Father would make contact, she gave him her business cards and contact information at their meetings.

In January 2017, Father was released from incarceration. Despite the permanency plan requirement that stated he was to contact DCS upon his release, Ms. Ridgell did not learn of his release until February 2017. Even then, Ms. Ridgell initiated the contact by reaching out to Father. Ms. Ridgell testified that she did not have any of Father's contact information, so she contacted him by sending a message through Facebook. According to Ms. Ridgell, Father initially responded by stating Mother was Malachi's primary parent, so there was no need for him to become involved in the case unless she was not going to receive custody. At the time, Father was aware Malachi was in foster care, but he believed Mother would regain custody. After Father's initial response, he stopped returning Ms. Ridgell's messages. Ms. Ridgell stated that in March and April 2017, she attempted to contact Father four more times, but he did not respond. Ms. Ridgell testified that the only time Father reached out to her was a single video call late at night, which she did not answer because she was asleep. In contrast, Father stated that the two would speak on the phone about arranging visitations. Eventually, in April 2017, Ms. Ridgell learned that Father was again incarcerated.

In April 2017, Father was incarcerated for violating the terms of his probation. The underlying convictions leading to Father's probation were reckless aggravated assault and the sale and delivery of schedule II drugs. The basis for Father's probation violation was him testing positive for methamphetamine, amphetamine, and marijuana. Upon learning that Father was again incarcerated, Ms. Ridgell made additional efforts to contact him in jail. She stated that, in June 2017, she mailed him additional copies of the family permanency plan and the criteria for termination of parental rights. Later in 2017, she met with Father while he was incarcerated. She testified that at this meeting, he informed her that he had only visited Malachi twice, once when Malachi was approximately one month old and once when he was one year old. At trial, Father disagreed with this statement and testified that he was frequently around Malachi prior to being incarcerated. However, he admitted that he has not seen Malachi since at least April 2015 because of his frequent incarcerations.

Father has remained incarcerated since April 2017. At trial, he claimed that he may be released in December 2020. However, he later stated that his sentence end date is in

_____

because he was under the impression that the only way his rights could be terminated was by having a ten-year prison sentence.

March 2021 and that he was denied parole in February 2019.

On July 24, 2019, while Father was incarcerated, DCS filed its petition to terminate Father's parental rights. The petition alleged that Father's rights should be terminated on the ground of abandonment by an incarcerated parent.[5] Thereafter, counsel was appointed to represent Father. The trial court heard the petition on February 3, 2020. At trial, Father was incarcerated and testified by telephone. Ms. Ridgell and Malachi's current foster parent testified in-person.

Along with many of the facts mentioned above, Father testified regarding his incarceration history, his progress in this case, and his efforts to parent Malachi. When asked why he did not become involved in the case between January 2017 and April 2017— when he was not incarcerated—Father stated that he "was involved as much as [he] could [be] as far as moral support" for Mother. As for visitations during this time, Father said he only attempted to visit Malachi one time, claiming that it was difficult to travel from Knoxville to Chattanooga. However, Father never requested help with transportation from Ms. Ridgell. Despite his criminal history, Father testified that he believes he shares a close relationship with Malachi that can be mended when he is released from incarceration. Father admitted that Malachi has never been in his custody, but he claimed Mother never gave him a fair opportunity to gain custody.

Ms. Ridgell testified in regard to her involvement in this case as the assigned family service worker. In contrast to Father's testimony, Ms. Ridgell stated that Father did not schedule visitations while he was not incarcerated. She also testified to Malachi's current foster placement. Since May 2019, Malachi has been in foster care. Malachi's half-siblings are also in the foster care of the same foster parent. Ms. Ridgell testified that she believed Malachi's transition into the foster home has been "really good" and that he has bonded well with his foster family and half-siblings. In Ms. Ridgell's opinion, removing Malachi from his current foster placement would remove him from the only family that he knows.

The foster mother testified regarding her time as Malachi's foster parent. In total, she has five foster children currently in her care, including Malachi's half-siblings. She stated that Malachi and his siblings argue as brothers but are loving and playful with each other. She stated that she has bonded with Malachi and intends to adopt him and his half-siblings, should they become available for adoption.

At the close of proof, the trial court issued an oral ruling on the petition to terminate Father's rights and subsequently entered its final order. In its final order, the court found

---

[5] The petition also alleged failure to manifest a willingness and ability to assume custody or financial responsibility as a ground for termination, but DCS withdrew this ground prior to the trial court's ruling.

- 4 -

that DCS proved abandonment by an incarcerated parent by clear and convincing evidence. The court also found that termination of Father's rights was in the best interest of Malachi. As a result, it terminated Father's parental rights to Malachi. Father timely appealed.

## II.    ISSUES PRESENTED

Father raises five issues on appeal, which we have slightly reworded:

1. Whether the trial court's findings of fact comply with the requirements in Tennessee Code Annotated section 36-1-113(k);

2. Whether Father's due process rights were violated when Malachi was adjudicated dependent and neglected, and if so, whether a violation would affect the current case;

3. Whether the trial court erred in finding there was clear and convincing evidence to show the ground of abandonment by an incarcerated parent;

4. Whether DCS made reasonable efforts to aid Father in this case; and

5. Whether the trial court erred in finding it was in the best interest of Malachi to terminate Father's parental rights.

For the reasons stated herein, we affirm the trial court's ruling and remand.

## III.    STANDARD OF REVIEW IN TERMINATION CASES

It is undisputed that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016); *see also Troxel v. Granville*, 530 U.S. 57, 65 (2000). This is because "[n]o civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Audrey S.*, 182 S.W.3d 838, 860 (Tenn. Ct. App. 2005). However, a parent's rights are not without limitations and may be terminated under certain circumstances. *In re Carrington H.*, 483 S.W.3d at 522; *In re Audrey S.*, 182 S.W.3d at 860.

A party that wishes to terminate the parental rights of another must prove two elements: (1) that there is at least one ground for termination; and (2) that terminating parental rights is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c);[6] *In re*

---

[6] The relevant portions of the Code that are cited in this opinion are cited according to how they appeared when DCS filed its petition on July 24, 2019.

- 5 -

*Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017); *In re Adoption of Angela E.*, 402 S.W.3d 636, 639 (Tenn. 2013). To ensure a parent's fundamental liberty interest is adequately protected, certain procedural safeguards are afforded to parents in termination cases. *In re Carrington H.*, 483 S.W.3d at 522; *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). One safeguard is that the petitioner must prove both elements of section 36-1-113(c) by clear and convincing evidence. *In re Carrington H.*, 483 S.W.3d at 522; *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Dakota C.R.*, 404 S.W.3d 484, 496 (Tenn. Ct. App. 2012). As our Supreme Court has previously explained:

> Among the constitutionally mandated fundamentally fair procedures is a heightened standard of proof—clear and convincing evidence. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings. The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.

*In re Carrington H.*, 483 S.W.3d at 522 (citations and quotation marks omitted).

On appeal, findings of fact are reviewed *de novo* with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Adoption of Angela E.*, 402 S.W.3d at 639; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Conclusions of law are also reviewed *de novo* but with no such presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524; *In re Bernard T.*, 319 S.W.3d at 597.

## IV. DISCUSSION

### A. Compliance with Section 36-1-113(k)

Father first takes issue with the trial court's final order. Specifically, Father claims that the order violates Tennessee Code Annotated section 36-1-113(k) because it was entered more than 30 days after the final hearing.[7]

At the time DCS filed its petition to terminate Father's rights, the relevant portion of section 36-1-113(k) stated, "[t]he [trial] court shall enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the

---

[7] Father also claims that the final order "is basically a regurgitation of the Termination Petition" and that the trial court "cannot simply rely upon DCS to draft an order." From our review of the record, we conclude that the findings found in the final order are properly supported by testimony and other evidence that was presented at trial.

- 6 -

hearing." Tenn. Code Ann. § 36-1-113(k). Requiring trial courts to enter timely orders allows this Court to "facilitate appellate review and promote just and speedy resolution of appeals." *In re Angela E.*, 303 S.W.3d 240, 251 (Tenn. 2010) (quoting *In re Audrey S.*, 182 S.W.3d at 861). In parental termination cases, section 36-1-113(k) promotes "the importance of permanently placing children," *id.* at 251 n.14, and "the General Assembly's mandate that parental termination cases be adjudicated as expeditiously as possible." *In re M.R.W.*, No. M2005-02329-COA-R3-PT, 2006 WL 1184010, at *3 (Tenn. Ct. App. May 3, 2006). While this mandate is clearly outlined, a court's failure to comply with the 30-day requirement does not limit this Court's ability to review the case on appeal. In such instances, the case may proceed on appeal because remand would not promote the just and speedy resolution of the case. *See In re Maison W.*, No. M2015-02153-COA-R3-PT, 2016 WL 3192801, at *16 (Tenn. Ct. App. May 27, 2016); *In re M.R.W.*, 2006 WL 1184010, at *3-4; *White v. Moody*, 171 S.W.3d 187, 191-92 (Tenn. Ct. App. 2004).

In the present case, the final hearing took place on February 3, 2020, and the trial court entered its final order on March 16, 2020,[8] 42 days later. While "compliance with the explicit requirements regarding written findings of fact and conclusions of law in termination cases [is viewed] with great seriousness," *White*, 171 S.W.3d at 191, we cannot say that vacating the final order and remanding would promote the just and speedy resolution of this case. In its final order, the trial court made extensive findings of fact that specifically detailed the testimony and evidence in this case. *See* Tenn. Code Ann. § 36-1-113(k) (requiring trial courts to "make[] specific findings of fact" in their final orders). As such, we find the order to be valid.

### B. Father's Due Process Rights

Father also asks this court to vacate the trial court's final order for alleged violations of his due process rights in Malachi's dependency and neglect case. In particular, Father claims that he was not afforded an opportunity to seek court-appointed counsel in the dependency and neglect case. He also asserts that there is no proof that he was properly served with the petition filed by DCS that alleged Malachi was dependent and neglected. Neither of these assertions is persuasive in this case.

Father correctly states that every "parent is entitled to representation by legal counsel at all stages of" a dependency and neglect or termination proceeding. *See* Tenn. Code Ann. § 37-1-126(a)(2)(B). Additionally, Father was not appointed legal counsel until after DCS filed its petition to terminate. There is no proof that indicates Father was afforded counsel in the underlying dependency and neglect case. Nevertheless, this Court has emphasized time and again, "any violation of [a parent's] due process rights . . . that

---

[8] On the front page of the order, the "stamped" entered date is 3/12/2020. However, the judge signed the order and another "stamp" date occurred on 3/16/2020. It is not clear why there are two dates listed. However, we consider the date of filing to be the last date upon which the order was stamped.

may have occurred at the dependent and neglect proceeding [may be] fully remedied by the procedural protections provided . . . at the termination hearing." *In re S.Y.*, 121 S.W.3d 358, 366 (Tenn. Ct. App. 2003); *see also In re Makenzie P.*, No. W2016-00400-COA-R3-PT, 2016 WL 5851876, at *4 (Tenn. Ct. App. Sept. 30, 2016). Stated differently, a "trial court's decision should not be reversed for any deprivation of due process that occurred at an initial dependency and neglect proceeding when [the parent] was afforded full procedural protection at the termination proceeding." *In re Hoover-Crawford*, No. M2000-01655-COA-R3-CV, 2001 WL 846044, at *5 (Tenn. Ct. App. July 27, 2001).

In this parental termination case, Father was afforded the representation of court-appointed counsel before and during trial, and such representation has continued on appeal. The record shows that he was given sufficient notice of the termination proceedings, and he does not argue otherwise. In the absence of any alleged due process violation in *the present termination case*, we hold that any potential violation of his due process rights in the dependency and neglect proceedings has no effect on this Court's authority to address the merits of this appeal.

### C. Abandonment by Incarcerated Parent

On appeal, when this Court reviews a trial court's decision to terminate parental rights, we must review each ground for termination, "regardless of whether the parent challenges [the] findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26; *see also In re Navada N.*, 498 S.W.3d 579, 589-90 (Tenn. Ct. App. 2016). In this case, the trial court found that Father "abandoned" Malachi by exhibiting a wanton disregard for the welfare of Malachi. As the only ground found by the trial court, we shall review this ground for termination.

In parental termination cases, "abandonment" can occur when:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding . . . or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding . . . [and] the parent or guardian has engaged in conduct prior to incarceration that *exhibits a wanton disregard for the welfare of the child*.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added). The focus of this definition of abandonment is "whether the parent 'has engaged in conduct prior to incarceration [that] exhibits a wanton disregard for the welfare of the child.'" *In re Audrey S.*, 182 S.W.3d at 865 (quoting Tenn. Code Ann. § 36-1-102(1)(A)(iv)). Unlike other definitions of abandonment under subsection (iv), this definition "is not expressly limited to any particular four-month period." *Id.* (stating that there are "two distinct tests for abandonment" under subsection (iv)).

Under subsection (iv), the term "wanton" has been described as "[u]nreasonably or maliciously risking harm while being utterly indifferent to the consequences." *In re Nevaeh B.*, E2019-01539-COA-PT, 2020 WL 1527001 at \*5 (Tenn. Ct. App. Mar. 31, 2020) (alteration in original) (quoting *In re O.W.*, No. W2019-01127-COA-R3-PT, 2020 WL 97727, at \*5 (Tenn. Ct. App. Jan. 9, 2020)). Previously, this Court has found on multiple occasions that a parent's criminal conduct and history of drug use are evidence of wanton disregard for the welfare of a child. *See In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) (listing previous cases). Similarly, "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 867-68 (citing *State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at \*7-8 (Tenn. Ct. App. Jan.11, 2005); *In re C. LaC.*, No. M2003-02164-COA-R3-PT, 2004 WL 533937, at \*7 (Tenn. Ct. App. Mar.17, 2004); *In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004); *In re C.W.W.*, 37 S.W.3d 467, 474-75 (Tenn. Ct. App. 2000)).

"A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child." *Id.* at 866. However, a parent's incarceration does not automatically lead to a conclusion of abandonment under subsection (iv). *See In re Johnathan M.*, 591 S.W.3d 546, 555 (Tenn. Ct. App. 2019) (quoting *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at \*8 (Tenn. Ct. App. Jan. 14, 2014)); *In re Audrey S.*, 182 S.W.3d at 866. Instead, a parent's incarceration acts only as a "triggering mechanism" that permits a court to look at the underlying circumstances to determine if the parent has exhibited a wanton disregard for the child. *In re Audrey S.*, 182 S.W.3d at 866. "When considering whether a parent's criminal conduct constitutes wanton disregard, we consider 'the severity and frequency of the criminal acts.'" *In re Johnathan M.*, 591 S.W.3d at 555 (quoting *In re Kierra B.*, 2014 WL 118504, at \*8).

DCS filed its petition to terminate Father's parental rights on July 24, 2019. Father testified that he was incarcerated on this date. At trial, Father testified that since Malachi was born in December 2013, he has been incarcerated five times for a variety of time periods. He was incarcerated two times in 2014 for a total period of approximately three months. In 2015, Father was incarcerated twice; one period was a single-day incarceration and the other spanned from April 2015 to January 2017. His final and current incarceration began in April 2017. As a result, the last date Father was not incarcerated was in April 2017. It is clear that Father was incarcerated both at the time the petition was filed and for all of the four months that immediately preceded the filing. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv).

The criminal acts that led to Father's incarcerations are varied. Previously, Father

- 9 -

was convicted for reckless aggravated assault; he was convicted for the sale and delivery of schedule II drugs; and he violated the terms of his probation, in part, by testing positive for a variety of illegal drugs.[9] At the time of trial, Father had another pending charge for allegedly possessing methamphetamine. Based on this long history of "probation violations, repeated incarceration[s], criminal behavior, [and] substance abuse," *In re Audrey S.*, 182 S.W.3d at 867-68, we agree with the trial court that Father's criminal actions while he was not incarcerated exhibited a wanton disregard for Malachi's welfare.

Aside from his criminal and drug-related activities, Father's actions when he was not incarcerated also showed a lack of concern for Malachi's welfare. While Father was incarcerated in 2016, Ms. Ridgell spoke with Father several times to discuss his responsibilities under the permanency plan. One of his responsibilities under the plan was to contact DCS upon leaving incarceration. Father left incarceration for a period of time in January 2017, but he did not initiate contact with DCS. Ms. Ridgell was not able to contact Father until she reached out to him. Even then, Ms. Ridgell testified, and the court found, that Father responded by stating he did not wish to get involved because he believed Mother was going to receive custody of Malachi.[10] Ms. Ridgell stated that her subsequent efforts to contact Father were unsuccessful until he was incarcerated again in April 2017.

"[A]ctions that our courts have commonly found to constitute wanton disregard reflect a 'me first' attitude involving the intentional performance of illegal or unreasonable acts and indifference to the consequences of the actions for the child." *In re Nevaeh B.*, 2020 WL 1527001, at *6 (quoting *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *3 (Tenn. Ct. App. June 9, 2015)). Contrary to his testimony at trial, Father's actions showed such an indifference. Father testified that he tried to make efforts to parent Malachi when Malachi was in Mother's custody. Yet, when Father was last released from incarceration in January 2017, knowing that Malachi was in foster care, Father declined to contact DCS. When Ms. Ridgell contacted him, he declined to take actions to become involved in Malachi's life and instead continued to commit criminal acts that led to his current incarceration. Throughout Malachi's life, when Father was not incarcerated, he has displayed a continuous indifference towards the welfare of Malachi.

---

[9] A drug screen submitted by Father tested positive for methamphetamine, amphetamines, and marijuana. While he admitted to using marijuana when he was not incarcerated, he claimed that the other substances entered his system by him simply touching the drugs.

[10] When asked about his efforts to contact DCS between January and April 2017, Father testified that he spoke with Ms. Ridgell about setting up visitations. Father also testified that he regularly visited Malachi before he was incarcerated. Ms. Ridgell's testimony was contrary to both of these points, stating that Father had only seen Malachi twice and that he did not ask to arrange visitations. In its final order, the trial court impliedly accepted Ms. Ridgell's testimony by finding that Father never requested visitations and has not maintained regular visitations. On appeal, we defer to the trial court's determinations on a witness's credibility, even when a witness testified by telephone. *Coleman v. Olson*, 551 S.W.3d 686, 694 (Tenn. 2018) (citing *King v. Anderson Cnty.*, 419 S.W.3d 232, 245-46 (Tenn. 2013)); *Kelly v. Kelly*, 445 S.W.3d 685, 695, 697 (Tenn. 2014).

For these reasons, we find that there is clear and convincing evidence to show that Father abandoned Malachi under Tennessee Code Annotated sections 36-1-102(1)(A)(iv) and -113(g)(1) by exhibiting a wanton disregard for the welfare of Malachi.

### D.  Best Interest Analysis

Having found that one ground for termination of Father's parental rights has been sufficiently proven, we shall now determine whether terminating Father's rights is in the best interest of Malachi.  *In re Gabriella D.*, 531 S.W.3d at 681; *In re Adoption of Angela E.*, 402 S.W.3d at 639.  In making this determination, courts are instructed to consider a non-exclusive list of nine factors.  Tenn. Code Ann. § 36-1-113(i); *In re Carrington H.*, 483 S.W.3d at 523; *In re Navada N.*, 498 S.W.3d at 607.  Those factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would

be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The weight a court places on a particular factor is determined by the facts of each case. *In re Audrey S.*, 182 S.W.3d at 878. In applying these factors, if the interests of the parent and the child conflict, the conflict is resolved in favor of the child. *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36-1-101(d); *White*, 171 S.W.3d at 194).

Father's continued criminal actions show that he has not made an adjustment or change to his conduct that would allow for Malachi to safely reside in his home. Father admits that he tested positive for methamphetamine and amphetamines prior to his current incarceration, although he claims that he tested positive simply by touching the drugs. However, he admitted to using marijuana when he was not incarcerated. Father testified that the earliest he will be released from incarceration is December 2020, but he also admitted that his sentence end date is not until March 2021. His most recent incarceration is consistent with a pattern of criminal conduct during Malachi's lifetime. Along with his previous criminal convictions, at the time of trial, Father had a pending felony charge for the alleged sale of methamphetamine. Taken together, factor (1) weighs in favor of terminating Father's parental rights.

Father has not exhibited a lasting adjustment to his circumstances despite continuous efforts by DCS to aid him. Throughout her time as the DCS family service worker in this case, Ms. Ridgell frequently spoke with Father in-person or on the telephone while he was incarcerated. During these conversations, Father and Ms. Ridgell would review his family permanency plan and the criteria for termination of his rights. When Father was released from incarceration in January 2017, Ms. Ridgell made additional efforts to communicate with Father through Facebook messaging. Ms. Ridgell made these efforts over the course of several months, often to no avail. Father's frequent and long-term incarcerations limited the support Ms. Ridgell could offer.[11] There is no indication

---

[11] For the first time on appeal, Father claims that DCS did not make reasonable efforts to aid him in this case. Father is incorrect in stating that DCS is required to make reasonable efforts as part of a best interest analysis. While courts "must *consider* all of the statutory factors," *In re Gabriella D.*, 531 S.W.3d at 682 (emphasis added), the absence of a finding on a particular factor is not fatal to a best interest determination. *See In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *16 (Tenn. Ct. App. Apr. 20, 2016) (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)); *In re K.E.D.M.*, No. E2008-00150-COA-R3-PT, 2008 WL 3982910, at *4 (Tenn. Ct. App. Aug. 27, 2008).

that additional efforts in the future would render a different result. Factor (2) weighs in favor of terminating Father's rights.

Ms. Ridgell testified, and the trial court found, that Father has not maintained any consistent contact with Malachi. The evidence does not preponderate against this finding. Further, although Father claims that he was actively involved in Malachi's life prior to being incarcerated, he admitted that he has not seen him since April 2015. Factor (3) weighs in favor of termination. Considering Father's lack of contact with Malachi or presence in his life, we agree with trial court that there is no meaningful relationship or bond between Father and Malachi. As a result, factor (4) also weighs in favor of terminating Father's parental rights.

Ms. Ridgell and the foster mother testified on the potential effect a change of caretakers and environment would have on Malachi. Malachi has been in the foster mother's home since May 2019. His two half-siblings are also placed there. With the exception of some behavioral issues at school, for which he has started to receive services, his transition into this home has been positive. Ms. Ridgell and the foster mother testified that Malachi has bonded with his entire foster family, who gives him love, care, and attention. Ms. Ridgell stated that she believes removing Malachi from the home would strip him of the only family that he knows. Additionally, the foster mother testified that she intends to adopt Malachi and his half-siblings, should they become available for adoption. Remaining in her care would help promote permanency and stability for Malachi. Factor (5) weighs in favor of termination.

There is no evidence to suggest that Father has abused Malachi or another member of his household. Additionally, there was no direct evidence on Father's mental or emotional status. As such, factors (6) and (8) weigh against terminating Father's parental rights.

Facts that pertain to factor (7) have been discussed at length. Father admitted that he used marijuana when he was not incarcerated. While he only admitted to using marijuana, he tested positive for several illegal substances in April 2017. Furthermore, his history of criminal acts and incarcerations has left him habitually unavailable to provide a home for Malachi. Even if Father was not incarcerated, his drug use and other criminal activities raise serious doubt as to whether he can provide a safe and stable home. Therefore, factor (7) weighs in favor of termination.

Aside from Father reportedly providing small items such as milk or diapers when Malachi was very young, he has not consistently provided child support for Malachi's care. However, this Court understands that Father has been incarcerated for the majority of

Regardless, considering the circumstances of this case, we find that the efforts made by DCS were reasonable.

- 13 -

Malachi's lifetime, and his ability to provide support while incarcerated has been significantly reduced. Still, when he was not incarcerated, Father made exceedingly sparse efforts to provide support. Factor (9) also weighs in favor of terminating Father's parental rights.

After considering all nine factors listed in Tennessee Code Annotated section 36-1-113(i), we agree with the trial court that the evidence clearly and convincingly shows it is in the best interest of Malachi to terminate Father's parental rights.

## V.     CONCLUSION

We affirm the finding that there is clear and convincing evidence to support the ground of abandonment by an incarcerated parent for Father's wanton disregard for the welfare of Malachi. We also affirm the trial court's conclusion that it is in the best interest of Malachi to terminate Father's parental rights. Therefore, for the reasons stated herein, we affirm the trial court order terminating Father's parental rights to Malachi.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant, Albert J., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE

- 14 -